McBRIDE, Judge.
This is a suit for mandamus and as a prelude to stating the case we mention certain pertinent facts.
The Keystone Life Insurance Company, a Louisiana corporation domiciled in New Orleans, is engaged in the business of industrial life insurance and has approximately eighty-seven stockholders. At the close of the fiscal years 1952 and 1954 substantial impairments to capital were required by the Secretary of State to be made good under authority of LSA-R.S. 22:77.
On April 9, 1955, certain of the shareholders by notarial act organized a ten-year voting trust which they styled “Keystone Shareholders Protective Association,” under which Dr. Leo S. Butler, Dr. W. R. Adams and C. L. Speaker were appointed trustees. This particular trust will be sometimes hereafter referred to as the “Keystone Trust” for the purpose of brevity.
On April 22, 1955, Dr. F. L. Johnson, who owned 140 shares of the capital stock of Keystone Life Insurance Company, as evidenced by stock certificate No. 312 which stood in his name, joined the Keystone Trust, but he continued to retain possession of his stock certificate and it does not appear there was ever any demand made upon him by the trustees for the delivery or surrender of the stock certificate. It is an odd circumstance that notwithstanding that the trustees of the Keystone Trust were never possessed of Johnson’s stock certificate, they issued to him Trust Certificate No. 57 in the Keystone Shareholders Protective Association for 140 shares of stock bearing the date April 22, 1955.
Through October 7, 1955, an apparent majority of the stockholders had subscribed to the Keystone Trust, but it is a conceded fact that a duplicate thereof had not, up to the date of the trial in the lower court, been filed in the registered office of the corporation. All that was ever filed in the corporate office was a photostatic copy of the agreement; this filing took place about ten minutes before noon on October 8, 1955, which was the date after which the corporate books were to be closed prior to the election of officers to be held ten days later by the corporation.
On August 23, 1955, certain other stockholders of Keystone Life Insurance Company, among whom were Ulric W. Pryce, Dr. Julius A. Phillips and Emmett H. Stanley (these three being, officers of the corporation) formed another voting trust for a term- of ten years, and for the purpose of identification we shall refer to it as “Trust No. 2.” Pryce, Phillips and Stanley were designated therein as trustees. On August 25, 1955, Pryce and Stanley went to Crowley, Louisiana, and called on Dr. Johnson importuning him to place in Trust No. 2 the voting rights to his 140 shares of stock in Keystone Life Insurance Company represented by the Certificate No. 312. Johnson ultimately saw fit to sign the agreement and two days afterward sent by mail his Certificate No. 312 for the 140 shares to the trustees of Trust No. 2. A certificate for 140 shares in Trust No. 2 was thereupon sent Johnson; this certificate bears the date August 23, 1955; Johnson exhibited it at the trial.
As would be the case, the 140 shares of stock of Keystone Life Insurance Com *567 pany represented by Certificate No. 312 which stood in Johnson’s name constituted the balance of voting power in the corporation, and whichever of the two rival factions has control of the voting privileges of these shares will have undisputed control of the management of the corporation.
It goes without saying that because John■son cast his lot with each group and received voting trust certificates from both, this was certain to breed litigation which came in the form of the present mandamus suit.
The relators are Johnson, individually, and Butler, Adams and Speaker, “Trustees of a voting trust known as Keystone Shareholders Protective Association.” They allege:
“ * * * about August 25, 1955, respondents Emmett H. Stanley and Ulric W. Pryce, who had full knowledge of the existence of the Keystone Shareholders Protective Association and that Dr. F, L. Johnson was a member thereof, approached Dr. Johnson and conjoled, tricked, and/or coerced him into signing the new voting trust composed of themselves and Julius A. Phillips as trustees, despite Dr. Johnson’s protestations, assertations, and insistences that he had previously obligated himself by joining the Keystone Shareholders Protective' Association. In spite of this knowledge, respondent trustees obtained from Dr. Johnson Certificate No. 312 representing 140 shares of stock owned by relator Johnson in the Keystone Life Insurance Company.”
The petition for mandamus further alleges that Pryce and Phillips, President and Secretary of the corporation, respectively, were “previously put on notice” that Dr. Johnson • had subscribed to the Keystone Shareholders Protective Association and they were in bad faith in cancelling Certificate No. 312 and in issuing a new stock certificate containing said 140 shares to themselves and Emmett H. Stanley, as trustees of Trust No. 2. It is further averred that Trust No. 2 had no right to receive or retain Johnson’s 140 shares of stock.
Relators pray that the respondent-trustees, Pryce, Phillips and Stanley, be mandated to surrender Certificate No. 404 of the Keystone Life Insurance Company “properly endorsed” to Phillips as Secretary of the corporation for cancellation and compelling Pryce, President, and Phillips, Secretary, to issue a new certificate representing 140 shares of stock of the Keystone Life Insurance Company to the relator-trustees.
Johnson prays, in the alternative, that Pryce, Phillips and Stanley be commanded to surrender Certificate 404 of the Keystone Life Insurance Company, properly endorsed, to Phillips, 'as Secretary of the corporation, and that Pryce, President, and Phillips, Secretary, be compelled to issue a ’ new certificate representing 140 shares of the stock of the corporation to him.
The respondents interposed several exceptions which were overruled, and' then they made answer to the petition in which they specifically assert that the Keystone Trust does not “comply with the provisions of the Louisiana Statutes [Annotated] 12:-33.” The answer further sets forth:
“That by an instrument dated August 23, 1955, Dr. F. L. Johnson and other stockholders of the Keystone Life Insurance Company,.executed a voting, trust, complying with all the requirements of L.S.A. 12:33 and named your defendants, ,U. W. Pryce, J. A. Phillips, M. D., and E. H. Stanley, as Trustees and agreed to forthwith endorse, assign and deliver to said trustees' the certificates of the shares of stock owned by them in said company and to do all things necessary 'for the transfer of their said stock to said trustees on the books of said company, as . will more fully appear by reference to said voting trust,.a ■ copy of-which is annexed hereto and made a part hereof.”
*568 Respondents then aver that after Johnson had signed Voting Trust No. 2, he made delivery of the certificate representing his 140 shares of stock to the trustees; that on or about September 9, 1955, a duplicate copy of Trust No. 2 was filed in the registered office of the Keystone Life Insurance Company; that Johnson’s Certificate No. 312 for 140 shares as well as the stock certificates of the other subscribers to Trust No. 2 were delivered to Keystone Life Insurance Company for cancellation, and on October 7, 1955, Certificate No. 404 for 2369 (the aggregate number of shares placed in trust) was issued in the names of respondent-trustees and delivered to them; that respondents at all times acted in good faith. Their prayer is that the demands of rela-tors be dismissed.
After a trial on the merits of the case, the trial court rendered judgment recalling the alternative writ of mandamus and dismissing the relators’ demands. They have appealed.
The first inquiry to be made is whether the trustees of the Keystone Shareholders Protective Association have any right or interest to assert the demands set forth in their petition for mandamus.
'Under the provisions of Art. 15, C.P.( an action can only be brought by one having a real and actual interest which he pursues, and the absence of a real and actual interest may be taken advantage of at any time during the trial of the suit. C.P. art. 346. In their answer the respondents make the special and specific plea that the Keystone Trust was never legally constituted.
The law of Louisiana concerning the creation of voting trusts and the powers vested in the trustees thereof is to be found in LSA-R.S. 12:33, the pertinent portions of which read as follows:
“A. Two or more shareholders of a corporation, pursuant to an agreement in writing, may transfer their shares to any person or corporation having authority to act as trustee, for the purpose of vesting in the transferee, as trustee, for a period not exceeding ten years and upon the terms and conditions stated in the agreement, all voting or other rights pertaining to such shares. This voting trust agreement may stipulate that the time of said agreement may be extended, under the same terms and conditions, for an additional period, not to exceed ten years from the date of expiration of the original agreement. * * *
“B. A duplicate copy of such agreement shall be filed in the registered office of the corporation and shall be open daily during business hours to the inspection of any shareholder or any depositor under said agreement, or the attorney of any shareholder or depositor.
“C. Whether or not the agreement so provides, every other shareholder may at any time transfer his shares to the same trustee or trustees upon the terms and conditions stated in said agreement, and thereupon shall be bound by, and shall have the benefits of all the provisions of said agreement.
“D. The certificates of shares transferred to a trustee shall be surrendered and cancelled, and ■ new certificates therefor issued to such person or corporation as trustee. In the new certificates it shall appear that they are issued pursuant to said agreement. In the entry of transfer on the books of the corporation it shall be noted that the transfer is made pursuant to said agreement.
“E. The trustee shall execute and deliver to the transferors voting trust certificates. Such voting trust certificates shall be transferable in the same manner and with the same effect as certificates of stock under the provisions of Part II of Chapter Six of this. Title.
*569 “F. The trustee or trustees shall possess all voting and other rights pertaining to the shares so transferred and registered in his or their names, subject to the terms and conditions of, and for the period specified in said agreement.”
Paragraph B of LSA-R.S. 12:33, it will be noticed, provides that a duplicate copy of the agreement shall be filed in the registered office of the corporation for inspection by any shareholder or any depositor under said agreement or the attorney of any shareholder or depositor. It is clear that it was the legislative intent in making such requirement to give an opportunity to stockholders and depositors to inspect the document itself so as to ascertain the terms thereof and to verify the names of those stockholders who had become subscribers, and to subscribe thereto themselves, if they deemed it wise to do so, by affixing their signatures to the duplicate. In such case the right to view the actual signatures of the subscribing stockholders is of no little importance. We stated above that a duplicate copy of the agreement under which it is contended by the relator-trustees they have the right to hold Johnson’s stock was never filed in the registered office of the Keystone Life Insurance Company, but instead only a photostat of the agreement was placed of record with the corporation. This type of copy does not contain the signatures of the subscribers nor does it afford others the opportunity to sign, and our opinion is that it does not have the legal effect and validity of a duplicate and does not satisfy the requirements of LSA-R.S. 12:33.
The word “duplicate” ordinarily embodies primarily the idea of exact identity, being the same as an original and having all of the legal effect and validity of an original. Nickle v. Lewis, Iowa, 272 N.W. 525; Wright v. Michigan Cent. R. Co., 6 Cir., 130 F. 843, 846, 65 C.C.A. 327. In the case last mentioned the court said:
“ * * * The meaning of the word (duplicate) in legal phraseology is the same as that in its use among business men. It is tersely and correctly stated in 10 Am. & Eng. Encycl. of Law, 318, as follows: ‘“Duplicate” is defined as a document which is the same in all respects as some other instrument, from which it is indistinguishable in its essence and operation.’ And many authorities are there cited in confirmation. A substantially like definition is given of the word in all the law dictionaries in common use. In Burrill’s Dictionary, verbum ‘Duplicate,’ is given the following ample definition:
“ ‘A duplicate is sometimes defined to be a copy of a thing, but, though generally a copy, a duplicate differs from a mere copy, in having all the validity of an original. Nor, it seems, need it be an exact copy. Defined also to be the counterpart of an instrument; but in indentures there is a distinction between counterparts executed by the several parties, respectively, each party affixing his or her seal to only one counterpart, and duplicate originals, each executed by all the parties.’ ”
It was pointed out by Dale E. Bennett in 2 La.Law Rev. 597 that there has been considerable conflict, at least in the verbiage of the decided cases, concerning the validity of voting trust argeements and that some courts have held them void on the theory that participating shareholders breached their duty to other owners of stock by stripping themselves of the power to exercise their voting prerogative, but:
“ * * * The modern and better view is that such agreements are valid where the purpose is proper. * * *
“ * * * The requirements that the agreement among the shareholders (which is essential in a voting trust) shall be in writing and filed in the registered office of the corporation, *570 must be strictly complied with if a valid trust is to be created. * * * ”
In one instance our Supreme Court held void and unenforceable a contract between certain stockholders and directors of a corporation in which they agreed that a person would be employed to manage the affairs of the corporation for three years by electing him President and retaining him in office for such term in view of provisions of the charter of the corporation which provided that the directors could not elect a president for a term longer than one year. Williams v. Fredericks, 187 La. 987, 175 So. 642.
In Davidson v. American Paper Mfg. Co., Inc., 188 La. 69, 175 So. 753, 763, 114 A.L.R. 1044, it was held that the admin-istratrix of a succession which owned stock in a corporation was, for two reasons, not precluded from voting the stock although the decedent had acquired the stock from a person who had previously signed a voting trust agreement:
“ * * * One reason is that the law relating'to voting trust agreements (Act No. 250 of 1928, § 33) was not complied with, and another reason is that subsequent to the date on which the parties signed that agreement they sold their stock and the transfers were made on the books of the corporation.”
While the printed report in Davidson v. American Paper Manufacturing Co., Inc., supra, does not mention the particulars in which the law pertaining to voting trusts had not been complied with, our examination of the record in the case shows, among other things, that a duplicate of such agreement was never filed in the registered office of the corporation.
In De Marco v. Paramount Ice Corp., Sup., 102 N.Y.S.2d 692, 696, the Supreme Court of New York wa§ concerned with the effect of a voting trust which had never been filed and reached the conclusion that the trust was inoperative until such time as the statute has been complied with by the filing- of the agreement. The Court said:
“As is to be noted, the statute is silent as to the time within which the voting trust is to be filed and does not provide for the legal effect of noncompliance. Though the opinion in Re Morse states that ‘No voting trust not within the terms of the statute is legal’, in my opinion, the failure to file merely means that the trust agreement is not invalid but merely inoperative to permit the trustees to exercise the voting-rights granted thereby until it is so filed. It may well be that after securing the signatures of 51% of the shareholders the trustees may desire to obtain additional signatures. It is not incumbent upon them immediately upon obtaining the signatures of the owners of 51% of the issued stock to file the agreement, nor is it requisite that the agreement be filed instanter after having secured the first signature. The non-filing does not render the agreement void ab initio. To hold otherwise would mean that in the interval between the execution by stockholders owning some of the shares pending solicitation of and participation by additional stockholdex-s an agreement would be rendered void and could not become validated and free from future attack, even though ultimately joined in by the majority or even all of the stockholders. Such a result would be incongruous and absurd. Where possible a statute will not be construed so as to lead to an incongruous or absurd situation, East v. Brooklyn Heights Railroad Co., 195 N.Y. 409, 88 N.E. 751, 23 L.R.A.,N.S., 513; Schmidt v. Wolf Contracting Co., 269 App.Div. 201, 55 N.Y.S.2d 162. Courts have the duty ‘to give effect to statutes as they are written and that we may not limit or extend the scope of the statute as written unless literal construction of the statute would produce a result which the Legislature plainly did not *571 intend.’ Russo v. Valentine, 294 N.Y. 338, at page 342, 62 N.E.2d 221, at page 222.
“A reasonable construction of Section 50 requires a finding that it was the intention of the legislature that a voting trust will merely be inoperative until such time as the statute has been complied with by the filing of the agreement so that all stockholders are afforded an opportunity to transfer their stock to the same trustees. Nor does the statute require that all stockholders be afforded like opportunity to participate therein prior to its filing nor that the contents of the agreement be made known prior to that time.”
The inevitable conclusion must be that the Keystone Trust has no legal standing and, therefore, the relator-trustees have not the real and actual interest contemplated by C.P. art. 15 to institute and prosecute the present litigation.
This brings us to the individual prayer ■of Johnson made in the alternative that the respondent-trustees be commanded to surrender Certificate No. 404 of the Keystone Life Insurance Company, properly endorsed, to the Secretary of the corporation, and that Pryce, President, and Phillips, Secretary, be compelled to issue and deliver another certificate for 140 shares of stock to him. First, let us say that we do not think that it took any “cajoling, trickery and/or coercion” on the part of Pryce and Stanley to secure Johnson’s signature on Voting Trust No. 2, as it is apparent that the real reason why Johnson gave the voting rights of his stock to the trustees of Trust No. 2 was that he thought they would elect him a member of the Board of Directors of the corporation. He testified this assurance was given by Pryce and Stanley.
Johnson, as the record fully reflects, is an intelligent and educated man, and no one could seriously doubt that he well knew what he was about when he subscribed to Trust No. 2 and he must have understood well that he was then deserting Keystone Shareholders Protective Association. The promises of reward were evidently so appealing that he completely overlooked the moral obligation he, perhaps, was under to Butler, Adams, Speaker and their associates. But regardless of any such obligation he owed them, he still had possession of his stock certificate and the stock stood on the corporation’s books in his name and so far as it affected his interests, he could legally transfer the stock to a third person. Davidson v. American Paper Mfg. Co., Inc., supra. Fletcher’s Cyclopedia of Corporations, Vol. 5, Sec. 2092, page 413, sets forth this rule:
“The voting power passes from the stockholder depositing his stock to the trustee or trustees of the voting trust to whom the stock is transferred * *. If, however, the stock remained standing on the corporate books in the name of the depositing stockholder, he would have the right to vote the shares, notwithstanding a power of attorney or proxy of the trustee.”
Johnson contends that even though he made the surrender of his stock certificate to the trustees of Trust No. 2, there was, after all, no valid transfer because he has never endorsed the certificate. Counsel call our attention to the fact that Trust No. 2 provides that “the subscribers shall forthwith indorse in blank and assign and deliver to the trustees the certificate of the shares of stock owned by them,” and the argument follows that without Johnson’s endorsement the stock certificate could not have legally passed to the respondent-trustees. Johnson and the trustees had the unqualified right, if they chose, to waive the provision of the agreement calling for the endorsement of the stock and that upon Johnson’s delivery of his certificate he in effect waived such condition.
The Uniform Stock Transfer Act, LSA-R.S. 12:524, provides in part:
*572 “A. Title to a certificate and to the shares represented thereby can be transferred only:
“(1) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or
“(2) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.”
We believe that the agreement establishing Trust No. 2 is sufficient in verbiage to constitute “a separate document containing a written assignment of the certificate” as contemplated by paragraph (2) in the above section, and that the passing of the certificate to the trustees, even though the certificate contained no endorsement, was a complete transfer by force of the law. The No. 2 Trust Agreement provides :
“3. The trustees shall hold the said shares of stock so transferred to them for the common benefit of the subscribers, under the terms and conditions hereinafter set forth.
“4. The trustees shall surrender to the proper officers of the said company for cancellation all certificates of stock which shall be assigned and delivered to them hereinbefore provided, and in their stead shall procure new certificates to be issued to them as trustees under this agreement.
“5. The trustees shall issue to each of the subscribers a trust certificate for the number of shares represented by the certificates of stock by him transferred to the trustees. Each such trust certificate shall state that it is issued under this agreement, and shall set forth the nature and proportional amount of the beneficial interest thereunder of the person to whom it is issued and shall be assignable after the manner of certificates of stock on books to be kept by the trustees. The trustees shall keep a list of the shares of stock transferred to them, and shall also keep a record of all trust certificates issued or transferred on their books, which record shall contain the names and addresses of the trust certificate holders and the number of shares represented by each such certificate. Such list and record shall be open at all reasonable times to the inspection of the trust certificate holders. Upon the transfer upon the books of the trustees of any trust certificate the transferee shall succeed to all the rights hereunder of the transferror.”
The facts show that the respondents, as they alleged in their answer, transferred all the certificates they received from the subscribing stockholders which aggregated 2,369 shares of stock, inclusive of Certificate No. 321 for the 140 shares standing in Johnson’s name, and that they delivered the same to the corporation which made cancellation thereof on the books and issued in-lieu thereof to the trustees of Trust No. 2 one certificate (No. 404) for 2,369 shares. This procedure was strictly in accordance with both the provisions of the trust agreement and the terms of the statute.
Even if it could be said that the respondents had not the right to have transferred on the books of the corporation the unen-dorsed certificate, then we believe that Johnson’s right to register objection would •be foreclosed by the unambiguous provisions of LSA-R.S. 12:532 which read:
“The delivery of a certificate by the person appearing by the certificate to be the owner thereof without the in-dorsement requisite for the transfer of the certificate and the shares rcpre- *573 sented thereby, but with intent to transfer such certificate or shares shall impose an obligation, in the absence of an agreement to the contrary, upon the person so delivering, to complete the transfer by making the necessary in-dorsement. The transfer shall take effect as of the time when the indorsement is actually made.
“This obligation may be specifically enforced.”
The case was correctly decided below.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.