[Civ. No. 28847.   Second Dist., Div. One.   June 8, 1965.]

HENRY WEINSTOCK, Plaintiff and Appellant, v. L. A. CARPET, INC., et al., Defendants and Respondents.

Harold Easton and Leo S. Rich for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, and Arthur C. de Goede, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Appellant.

Oshman & Brownfield and Richard H. Oshman for Defendants and Respondents.

LILLIE, J.—Appellant sued to recover $15,000 he claims he paid on March 12, 1959, for shares of corporate stock issued without a permit from the Corporation Commissioner. Upon completion of plaintiff's case the trial court granted defendants' motion for judgment under section 631.8, Code of Civil Procedure. Findings were made and judgment was entered in favor of defendants; plaintiff appeals therefrom.

In addition to plaintiff's testimony, the record contains the testimony of defendant Barnett under section 2055, Code of

Civil Procedure, and various exhibits. ▮ The trial court having weighed the evidence in determining the motion (§ 631.8), we treat the court's findings and judgment as though they had been made after a trial in which evidence was produced in support of both sides (*Woolliscroft* v. *Starr*, 225 Cal.App.2d 667, 669 [37 Cal.Rptr. 570]; *Estate of Sharff*, 219 Cal.App.2d 128, 132 [33 Cal.Rptr. 52]); thus, we view the evidence in the light most favorable to respondents.

Between July and October 1958, plaintiff, a carpet salesman, who had prior experience in the retail carpet business, and defendant Barnett, operator and owner of several carpet establishments, discussed and negotiated a plan between themselves to jointly engage in the retail carpet business; and in January 1959, as copromoters, they engaged defendant Berris, an attorney, to organize a corporation for the purpose of taking over the operation of Dorn's Carpet Division, an individual proprietorship owned by Barnett. They planned to open branches in several stores which plaintiff was to manage under an employment contract with the corporation. Plaintiff and Barnett each was to receive 50 per cent of the stock to be issued in exchange for his investment; plaintiff was to invest $15,000 and the investment of Barnett was to be the inventory and accounts receivable of Dorn's Carpet Division, in an amount equal to $15,000.

On February 16, 1959, defendant corporation was formed. Plaintiff and Barnett were the incorporators; they were to have equal control. Plaintiff became president and a director; Barnett became secretary and a director. On February 29, 1959, plaintiff, as president of defendant corporation, executed and filed a Certificate of Corporation for Transaction of Business under a Fictitious Name; he also executed to himself a contract of employment engaging himself as manager of the branch stores. Plaintiff and defendant then discussed with Berris the necessity of applying for and receiving a permit from the Corporation Commissioner so that defendant corporation could issue stock. Berris advised them that a corporate bank account should be set up so that the corporation could function prior to the issue of stock; he further advised that each lend to the corporation the sum of $15,000 for this purpose. They agreed to lend the corporation the money and opened the corporate bank account on March 12, 1959; as a loan to defendant corporation, each deposited $15,000 in the account. Plaintiff also deposited the $15,000 he had originally agreed to invest. The bank account was

controlled by the signature of plaintiff or his son and the cosignature of Barnett. A corporate check was drawn to the order of Barnett for $15,000 in full payment of the individual proprietorship known as Dorn's Carpet Division. Thereafter, on March 23, 1959, plaintiff, as president, executed and acknowledged an application for a permit to sell and issue 30,000 shares of stock to plaintiff and defendant for cash; it contained the statement that none of the proposed shares had been issued. It was filed with the Corporation Commissioner on April 2, 1959; the permit was received in June 1959. It authorized the issue of stock in exchange for cash; however, in October 1959 the stock was issued without payment of any money or "anything like merchandise, or anything of that nature." The certificates were signed by plaintiff as president of the corporation and Barnett as secretary. They each received 50 per cent of the stock. Prior to this, on July 1, 1959, plaintiff began his employment with defendant corporation and worked as manager of the several branch stores until December 24, 1959, when the corporation ceased operations.

The trial court concluded that there was no violation of the Corporate Securities Law. It found that the transaction of March 12, 1959, constituted a loan to defendant corporation (findings of fact, par. 1); that plaintiff at the time knew that no application for permit for defendant corporation to issue stock had been made and no permit had been issued (par. 2); that plaintiff was at all times promoter, organizer, president, and director of defendant corporation, and as president signed the application for permit to issue stock on March 23, 1959, and was cosigner of the corporate bank account (par. 8); and that plaintiff was *in pari delicto* with defendants "if there was a technical violation of the Corporate Securities Act" (par. 15).

At all times the main issue was "Whether the transaction involved herein constituted a violation of the Corporate Securities Act..." (joint pretrial statement; A.O.B. p. 2) inherent in which was the basic question whether the stock issued by defendant corporation was a security within the provisions of the Corporate Securities Law. At the outset, before he could establish a violation, plaintiff had to sustain his burden of proving that the issue of corporate securities was embraced by the statute. Whether a security is to be considered one within the meaning of the Corporate Securities Law is a question to be determined in each case; and "In

arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and securities based thereon. (*In re Hatch*, 10 Cal.2d 147, 151-152 [73 P.2d 885].)'' (*People* v. *Syde*, 37 Cal.2d 765, 768 [235 P.2d 601].) Accordingly, an exemption from the operation of the Corporate Securities Law is ''(m) Any bona fide joint adventure interest, except such interests when offered to the public.'' (Corp. Code, § 25100.) This has been interpreted to mean corporate securities as between joint venturers, partners, or copromoters of a corporation, where the parties are equal owners and stand on equal footing as entrepreneurs, where no stock is offered to or sold to the general public, where the corporate function is but a mere convenient instrumentality through which they, who own all of the corporate stock and control the conduct of its affairs, transact their business, and where the interests of third parties are not affected. (*Holmberg* v. *Marsden*, 30 Cal.2d 592, 597 [248 P.2d 417]; *Hillman* v. *Hillman Land Co.*, 81 Cal.App.2d 174, 183-184 [183 P.2d 730]; *Hargiss* v. *Royal Air Properties, Inc.*, 206 Cal.App.2d 406, 412 [23 Cal.Rptr. 678].)

A joint venture requires little formality in its creation (*Gross* v. *Raeburn*, 219 Cal.App.2d 792, 801 [33 Cal.Rptr. 432]); it may be the result of a parol agreement or it may be assumed as a reasonable deduction from the acts and declarations of the parties. (*Nelson* v. *Abraham*, 29 Cal.2d 745, 749-750 [177 P.2d 931].) Here, the evidence shows that plaintiff and defendant Barnett were joint venturers standing on equal footing as entrepreneurs; that the purpose of the enterprise was to engage in the business of selling carpets; that both parties had prior extensive experience in the retail carpet business; that there was a community of interest in a mutual endeavor over which they exercised joint control for the purpose of making a profit; and that they were to share in profits and losses equally. (*Lasry* v. *Lederman*, 147 Cal.App.2d 480, 485-486 [305 P.2d 663]; *People* v. *Woolson*, 181 Cal.App.2d 657, 669 [5 Cal.Rptr. 766]; *Ragghianti* v. *Sherwin*, 196 Cal.App.2d 345, 351 [16 Cal.Rptr. 583].)

It was not contemplated by the parties, especially plaintiff, that he would play the passive roll of investor. (*Goldberg* v. *Paramount Oil Co.*, 143 Cal.App.2d 215 [300 P.2d 329]; *Rivlin* v. *Levine*, 195 Cal.App.2d 13, 25 [15 Cal.Rptr. 587].)

From the beginning of their negotiations plaintiff, at the very least, was copromoter and coorganizer; thereafter he actively participated in the conduct of the enterprise from which he expected to reap a profit. (*People* v. *Syde*, 37 Cal.2d 765 [235 P.2d 601].) He managed the business under an employment contract which he negotiated with the corporation, became corporation president and director and signed all of its official documents. ■ The fact that a corporation was formed as the vehicle by which the enterprise could accomplish the partners' business venture does not preclude a finding of a joint venture (*People* v. *Clark*, 215 Cal.App.2d 734, 749 [30 Cal.Rptr. 487]), and under the circumstances is considered "simply the *alter ego*" of the joint venturers. (*Hargiss* v. *Royal Air Properties, Inc.*, 206 Cal.App.2d 406, 410 [23 Cal.Rptr. 678].) No corporate stock was issued to anyone other than plaintiff and defendant Barnett—they shared equally, each taking 50 per cent of the stock. ■ "Where a corporation is the instrumentality of individuals who control the conduct of its affairs and where the interests of third parties are not affected, the corporation is treated as the mere agency of the associates created for the sake of convenience in carrying out an agreement made before the corporation was organized." (*Hillman* v. *Hillman Land Co.*, 81 Cal.App.2d 174, 184-185 [183 P.2d 730].)

*Hargiss* v. *Royal Air Properties, Inc.*, is dispositive of the basic issue. Three persons, plaintiff, Heathman and Peister invested money for the purchase and development of certain real estate. Profits and losses were to be shared equally; six months later a corporate formation was completed; each investor contributed to defendant corporation additional money, and promissory notes were issued by it for the amounts advanced. Thereafter plaintiff, as president, and Peister, as secretary, applied for a permit to sell stock in equal amounts to each partner in extinguishment of the notes. The court held that defendant corporation, having issued notes containing the provision "To Be Replaced By Stock And/Or Notes," for money received prior to obtaining a permit to issue stock, did not violate the Corporate Securities Law. It concluded that the trial court was justified in the view that the transaction was valid, the corporation being a mere vehicle for the accomplishment of the partners' business venture, the notes being mere memoranda of the equal investment of each party. (P. 412.) As to whether a violation of the Corporate Securities Law occurred, the court said at pages

410, 412: "If therefore the trial court took the position, as it was fully entitled to do under the undisputed facts, that this enterprise was, as to the three partners, a joint venture, partnership or copromotion of a corporation, it was exempt from the provisions of the Corporate Securities Act respecting the point made by plaintiff. The three were equal owners; there was no stock offered to nor sold to the general public; the notes were not offered to the public nor to an underwriter. ... Thus the corporation was simply the *alter ego* of the three partners as the vehicle by which their enterprise was finally put into legal form for organization purposes. Of course, had outsiders actually been brought in and stock subscribed to or sold to them the legal picture, as to such outsiders, would have been entirely different. But that did not happen. ...

■ "The purpose of the Corporate Securities Act is to protect innocent investors. (*People* v. *Syde,* 37 Cal.2d 765, 768 [1] [235 P.2d 601].)" As stated in *Holmberg* v. *Marsden,* 39 Cal.2d 592 [248 P.2d 417], it is significant that it was only after the financial outlook began to worsen that plaintiff sought to recover his contribution. There appears to be no more reason for defendants to reimburse plaintiff for his contribution to the venture than for plaintiff to reimburse defendant Barnett for his.

■ Plaintiff's contention, that the $15,000 deposited by him in the corporate bank account was intended as consideration for the issuance of stock in defendant corporation, raised an issue of fact in the trial court. Accordingly it found that the transaction of March 12, 1959, instead, constituted a loan to defendant corporation, and concluded that there was no violation of the Corporate Securities Law in that connection. The finding being supported by competent and substantial evidence, we will not disturb the trial court's determination. (*Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Berniker* v. *Berniker,* 30 Cal.2d 439 [192 P.2d 557].)

■ Barnett's testimony leads to but one reasonable conclusion—that the $15,000 constituted a loan to defendant corporation. At the outset of their promotion Berris advised plaintiff and Barnett to open a corporate bank account so that the corporation could transact business, and advised them to put into it $15,000 each, "as a loan to the corporation." Berris told plaintiff that "he would get his money back at some time ... it was a loan, and the corporation would pay both of us back." Thereupon they orally agreed

to advance a total of $30,000 to the corporation ''to start it going,'' and they each put $15,000 in the account ''as a loan''; the stock issued in October 1959 was not intended to represent this money. They ''planned that the stock would be issued in due time for cash''; Berris made it clear ''that we had to buy it [stock] for cash . . . our books are set up exactly that way.'' At the time plaintiff deposited his $15,000 he knew that no application had been made for a permit to issue stock, no permit had been received and no stock had been issued; in fact, it was not until March 23, 1959, that plaintiff, as president of defendant corporation, executed and acknowledged the application and filed the same on April 1, 1959. It contained the statement that no stock had been issued by defendant corporation. The permit was received around June or early July but the certificates were not issued until October because, according to Barnett, ''the corporation didn't have the money to pay our loans back, which we needed the money to buy the stock''; the business was failing and in the ''waning moments'' of the company plaintiff became ''hysterical'' and insisted to Barnett that he be given 50 per cent of the stock to show ''some receipts'' for the $15,000 he had invested; finally at plaintiff's insistence, ''and to get him out of the way,'' Barnett as secretary, and plaintiff as president, signed the stock certificates, and the same were issued to themselves. Barnett testified that this was not done ''according to Mr. Berris [advice].'' Moreover, the permit authorized the issuance of stock in exchange for cash, but the certificates were given to each party without the payment of any money. The corporation received no cash for the stock.

By reference to the Joint Pretrial Statement, the trial court found that ''if there was a technical violation of the Corporate Securities Act'' in October 1959, when the certificates were issued without a cash transaction, plaintiff was *in pari delicto* with defendants and could not recover. (Findings of fact, par. 15.) This finding is amply supported by the evidence. Plaintiff was an experienced businessman who had long been engaged in the carpet business; he was an original promoter, organizer, and incorporator, and after defendant corporation was formed, he immediately became president and director, and on behalf of defendant corporation executed various official documents. He, as president, signed the bank card resolution and the bank account cards; the corporate account was controlled by his signature, or his son's, and the

cosignature of defendant Barnett. As president he executed and acknowledged the application for permit to sell and issue the securities. He managed the business of the branch stores, and it was he who instigated the issue of stock to himself and signed the certificates. The record does not show that defendant Barnett was any more culpable in the matter of issuing the securities than plaintiff. As in *Hargiss* v. *Royal Air Properties, Inc.,* 206 Cal.App.2d 406 [23 Cal.Rptr. 678], it is difficult to understand how plaintiff could avoid the position of being *in pari delicto.* He was the original moving spirit in the entire enterprise. Everything done prior to October 1959 was under his guidance and direction. At his own insistence, he as president of defendant corporation had the stock issued to himself. If there was a violation he was the one who urged it. (206 Cal.App.2d 410.)

As hereinabove set out, the enterprise was, as to plaintiff and defendant, a joint venture or copromotion of a corporation and the securities were exempt from the operation of the provisions of the Corporate Securities Law; moreover the transaction was valid, the corporation being a mere vehicle for the accomplishment of the partners' business venture, the stock being but mere memoranda or "receipts" of the equal investment of each party. If there was any technical violation in October 1959, wherein the certificates were issued without an exchange of cash as required by the permit, plaintiff, acting as the prime mover of their issuance, was *in pari delicto* with defendants and in no position to recover.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 4, 1965.