341 So.2d 436 (1976)
Belle Virginia GOLDBLUM, Testamentary Executrix of the Succession of George J. Woolhandler, Plaintiff-Appellee,
v.
C. Elmo BOYD et al., Defendants-Appellees, and
Doctors' Hospital, Inc., Defendants-Appellant.
No. 13040.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1976.
Rehearing Denied January 10, 1977.
*437 Wiener, Weiss & Madison by Jacques L. Wiener, Shreveport, for defendant-appellant.
Simon Herold, Shreveport, Alston, Miller & Gaines by Robert W. Miller, Jonathan W. Lowe, John K. Train, III, Atlanta, Ga., Law Offices of James A. Van Hook by James A. Van Hook, J. Patrick Hennessy, Shreveport, for plaintiff-appellee.
Blanchard, Walker, O'Quin & Roberts by Robert Roberts, Jr., John T. Cox, Shreveport, for defendants-appellees.
Before PRICE, HALL and MARVIN, JJ.
En Banc. Rehearing Denied January 10, 1977.
MARVIN, Judge.
This suit arises out of a struggle between two opposing groups of shareholders for the control and operation of Doctors Hospital in Shreveport. Majority control of Doctors Hospital, Inc. hinges upon 946 shares (less than four percent of 25,880 outstanding shares) originally held by Dr. George J. Woolhandler, whose testamentary executrix (Belle Virginia Goldblum) is plaintiff-appellant.
To preserve their control against dissident shareholders who had united behind Charter Medical Corporation (Charter) and caused the stock struggle, defendant Dr. C. E. Boyd, Dr. Woolhandler, and others, who enjoyed the management of the corporation, marshalled forces in early March, 1971, and entered into three agreements. Dr. Woolhandler died about seven months after the first of these agreements was executed. After some fruitless negotiations with Dr. Boyd, Dr. Woolhandler's testamentary executrix aligned with the dissident shareholders behind Charter and brought this suit to "free" the Woolhandler stock from the effect of the three agreements.[1]
The validity of these agreementsa "voting trust," a proxy and option to purchase, and a "shareholder's agreement" restricting transfer of sharesraise several complex *438 issues relating to state and federal law affecting corporate stock and "securities."[2] The lower court upheld the validity of each agreement. The reconventional demand for damages against Mrs. Goldblum was rejected. Both parties appeal. We affirm in part and reverse in part.

FACTUAL BACKGROUND
Defendant Dr. Boyd, with other doctors and individuals, incorporated Doctors Hospital in 1959. Dr. Boyd has served as its principal executive officer, Chairman of the Board, since incorporation. He is the chief of the hospital's medical staff. His son, Charles E. Boyd, is the hospital's administrator. Dr. Boyd maintains a private office in his medical clinic at 6815 Southern Avenue, approximately five miles from Doctors Hospital.
Dr. Woolhandler was the hospital radiologist whose only professional office was in the hospital. He was active in the management of the corporation as its Treasurer, as a member of the executive committee, and as vice-chairman of its Board of Directors for several years before the stock struggle arose.
In August, 1970, Doctors Hospital solicited Charter to negotiate with the corporation for the purpose of Charter's acquiring the hospital or the stock of the corporation "in the neighborhood of $2,000 per share."[3] Other hospital management companies similar to Charter were also solicited. After negotiations for this purpose proved fruitless, dissident shareholders, including medical doctors who were members of the Board of Directors and the Executive Committee, united behind Charter and Charter began to acquire shares or proxies and options to purchase shares from persons owning stock in Doctors Hospital.
On February 28, 1971, Dr. Boyd and the management of the corporation learned of Charter's efforts to acquire control of a majority of the shares. Dr. Boyd, Dr. Woolhandler, with three other doctors who were members of the executive committee of Doctors Hospital, met with other shareholders friendly to them (hereafter Boyd group) to devise and implement means to thwart the efforts of the dissident group.
The Boyd group adapted to their purposes the six-month option-proxy form which Charter was using in its efforts. The Boyd group also pooled or pledged to pool approximately $100,000 with which to acquire shares from shareholders uncommitted to either group. Dr. Woolhandler contributed to the pool of funds and received his ratable share of the stock so purchased.
Within a few days and by about March 2, 1971, the Boyd group had secured sufficient shares or associated a sufficient number of shareholders with their group to insure their majority control for approximately a six-month period. After this initial activity, the Boyd group sought legal counsel and means by which their majority control might extend for a longer time.[4] The result was the three agreements at issue. Dr. Boyd was the moving factor for the Boyd group, but Dr. Woolhandler, to a limited extent, solicited or participated in the solicitation of other shareholders to join the Boyd group by executing the agreements in question or by selling stock to the Boyd group.
After Dr. Woolhandler's death, Charter offered to purchase his shares from his executrix at $200 a share. She in turn, offered to sell the Woolhandler shares to Dr. Boyd or to his group. Dr. Boyd made counter offers to her for approximately $100 per share. When she and Dr. Boyd or his group reached an impasse in negotiations, she agreed to sell to Charter by a written agreement. She agreed to litigate the validity of the three agreements in question, *439 but at Charter's limited expense and at Charter's direction. Charter agreed to pay $200 per share for the Woolhandler stock when "freed" from the three agreements in question. The four Woolhandler heirs also made the same agreement with Charter to sell Doctors Hospital stock they had inherited from their late mother and which they would inherit by bequest from their late father.[5]
At this juncture, we recognize the dilemma of the executrix. She stands in the legal stead of the late Dr. Woolhandler while charged on the other hand, with the duty of a prudent administrator to obtain maximum value for the succession asset. The book value of the stock before the struggle came to light was approximately $70 per share. The average price paid by the Boyd group in early 1971 was approximately $93 per share. Average earnings per share of the Woolhandler stock for the five-year period before his death was $7.05. The Woolhandler stock earned only $1.00 per year in dividends. The Woolhandler shares were valued in his succession proceedings and federal estate tax return at $47.30 per share, depreciated because of earnings capitalization and because of the restrictions imposed thereon by the three agreements in litigation.

THE VOTING TRUST AGREEMENT
Two trusts with identical provisions were executed. The first, for a five-year term, was executed on dates beginning March 5, 1971. The second, for an eight-year term, was executed on dates beginning March 19, 1971. Trustees are four doctors, including Dr. Boyd and Dr. Woolhandler, and one attorney. The Trust is for the stated (and only) purpose ". . . of vesting in the . . . trustees all voting and other rights pertaining to [the] shares."
Other shareholders of Doctors Hospital, Inc. may join the trust at any time with approval of two-thirds of the shareholders in the trust. The trust may be terminated before eight years by two-thirds of the shareholders in the trust. No compensation is provided for the trustees and all dividends received by the trustees are required to be transmitted to the trust certificate holders without any deduction.

THE OPTION TO PURCHASE
About March 20, 1971, Dr. Woolhandler sold to Dr. Boyd an "option" to purchase his shares ". . . and any other securities" in Doctors Hospital, Inc. Dr. Boyd purchased identical "options" from other members of the Boyd group about this same time. Dr. Boyd gave a similar "option" collectively to those of his group to purchase his stock.
The "option," for a period of 15 years, was given for a recited consideration of $25.00 which was shown to have been paid Dr. Woolhandler. The "option" is more correctly a right of first refusal because its only provision is as follows:
"1. Upon appearors [sic] receipt of a bona fide offer from any other party for the purchase of appearor's stock or other securities in Doctors' Hospital, Inc., appearor shall deliver to C. Elmo Boyd in writing a detailed explanation of all terms and conditions of such offer and C. Elmo Boyd shall have thirty (30) days from receipt of such notice within which to purchase said stock or other securities on the same terms and conditions as set forth in the bona fide offer. Should C. Elmo Boyd not exercise the option to purchase within such time then and only then shall appearor be free to sell the subject stock or securities to the said appearor and then only on the exact terms and conditions of the offer." [sic].

THE SHAREHOLDER'S AGREEMENT
This agreement was executed on dates beginning June 9, 1971. It provides:
"I. The purpose of this AGREEMENT is to perpetuate control of the corporation in SHAREHOLDERS and each SHAREHOLDER joins herein in consideration of *440 the joinder of the remaining SHAREHOLDERS. . .
"II. Each SHAREHOLDER has heretofore joined in a VOTING TRUST AGREEMENT, dated March, 1971, which is on file at the office of DOCTORS' HOSPITAL, INC., and all stock owned by each has been placed in the name of the Voting Trustees, who have issued voting trust certificates therefor. The Voting Trust is hereby affirmed and this AGREEMENT shall apply both to SHAREHOLDERS' stock and to their interest in the Voting Trust.

* * * * * *
"IV. Each SHAREHOLDER agrees on behalf of himself, his heirs and assigns not to sell or transfer any of his stock in DOCTORS' HOSPITAL, INC. or any voting trust certificate relative thereto to anyone other than another SHAREHOLDER, that is, to another party to this agreement without the written consent of 80% of the other SHAREHOLER parties hereto, except on the following terms and conditions:
"1. If a SHAREHOLDER receives an offer from a third party (THIRD PARTY) to purchase his stock or voting trust certificates that he wishes to accept, he shall nevertheless reject the offer unless it is solely for cash and unless THIRD PARTY shall agree to purchase all stock and voting trust interests of all SHAREHOLDERS for the same price. In such event the offer of THIRD PARTY shall be made in writing, deposited in the U.S. Mails, addressed to each SHAREHOLDER at his address as it appears at the time of the mailing on the stock registry of the Corporation or on the list of voting trust certificate owners maintained by the Trustees under the Voting Trust Agreement.
"Contemporaneously with the mailing of the offer, THIRD PARTY shall deposit in escrow with the Shreveport Bank & Trust Company cash in an amount equal to the purchase price of all shares or trust certificates owned by the SHAREHOLDERS, together with an agreement to purchase all stock tendered within forty-five (45) days, which deposit and offer shall be, and remain, irrevocable for 45 days from the date of mailing the notice of offer to the SHAREHOLDERS.
"The notice from THIRD PARTY to SHAREHOLDERS shall direct any SHAREHOLDER desiring to accept the offer to tender his stock through the Trust Department of the Shreveport Bank & Trust Company within 21 days from the mailing of the offer properly stamped and addressed. The date of mailing may be proved only by a certified or registered mail receipt, and receipts showing the mailing of the offer to each SHAREHOLDER on the same date shall be delivered to the Shreveport Bank & Trust Company with the cash deposit required above.
"2. Each SHAREHOLDER accepting THIRD PARTY'S offer (hereinafter called TENDERING SHAREHOLDER) agrees that should any other SHAREHOLDER or group of SHAREHOLDERS (hereinafter called DECLINING SHAREHOLDERS) not elect within the 21 day period to accept THIRD PARTY'S offer, such DECLINING SHAREHOLDERS may, at their option, purchase the shares tendered by the TENDERING SHAREHOLDERS at the price offered by THIRD PARTY, in which event all shares so tendered must be purchased.
"DECLINING SHAREHOLDERS must advise the Escrow Agent of their wish to purchase all stock of TENDERING SHAREHOLDERS within 14 days of the expiration of the 21-day period referred to above in sub-paragraph (1) of this paragraph. Each DECLINING SHAREHOLDER shall have the right to purchase the shares of TENDERING SHAREHOLDERS ratably in the percentage that his shares bear to all shares owned by DECLINING SHAREHOLDERS.
"3. Should any DECLINING SHAREHOLDERS elect not to participate in the purchase of the tendered shares, the remaining DECLINING SHAREHOLDERS shall have 10 days within which to *441 elect to purchase all tendered shares, or to change their position and accept THIRD PARTY'S offer.
"V. Certain SHAREHOLDERS have entered into written contracts granting to other SHAREHOLDERS the right of first refusal to purchase their stock or voting trust certificates and nothing herein shall be construed to void such agreements. The right of first refusal granted to SHAREHOLDERS in paragraph IV hereof shall take precedence over such previously executed agreements, and any stock sold pursuant to the earlier agreements shall be and remain fully subject to this AGREEMENT.
"VI. This AGREEMENT shall remain in effect for a period of 9 years from the date hereof (June 1, 1971) and any attempt by any SHAREHOLDER to transfer stock or voting trust certificates in contravention of its terms shall not only be void, but shall constitute an offer by such SHAREHOLDER to the remaining SHAREHOLDERS to sell to them his stock at book value, as it appears from the most recent annual audited statement. The offer shall remain open for 45 days from the time such certificate is submitted to DOCTORS" HOSPITAL, INC. for reissue. In addition, the party attempting to make such prohibited transfer shall pay to the remaining parties hereto, as liquidated damages, an amount equal to $50.00 per share for the stock so offered which amount may be deducted from the purchase price. The right of each SHAREHOLDER to purchase such stock, and his participation in the liquidated damages shall be proportionate to his share ownership.
"VII. The Corporation and the Trustees under the Voting Trust are authorized and instructed by each SHAREHOLDER to refuse to transfer his shares or voting trust certificates subject to this AGREEMENT unless the SHAREHOLDER requesting the transfer shall have produced proof of compliance with the terms of this AGREEMENT. When such proof is presented, the Corporation shall have 30 days in which to determine its validity, or submit the matter to the District Court for the Parish of Caddo, for a declaratory judgment.
"VIII. Nothing herein shall prevent the transfer by sale, gift, inheritance, or otherwise by any SHAREHOLDER to his spouse, or any ascendant, descendant, or sibling, but the transferee shall take subject to all terms and conditions of this AGREEMENT, and by accepting the stock or voting trust certificates so transferred shall be deemed to join herein and accept the obligations hereof.
"IX. By the consent in writing of the holders of 80% of the stock or voting trust certificates subject hereto, this AGREEMENT may be cancelled or other SHAREHOLDERS, or voting trust certificate holders, may be permitted to join herein.

* * * * * *
"X. Each SHAREHOLDER recognizes and affirms that a transfer of stock or a trust interest in contravention of this AGREEMENT would cause irreparable damage to the remaining SHAREHOLDERS, so the right to an injunction is specifically granted to each SHAREHOLDER should it appear that any party hereto is about to attempt such a transfer. * * *"

LOWER COURT'S JUDGMENT
Judgment below rejected the demands of the executrix, holding the late Dr. Woolhandler, and consequently his executrix, "estopped" from asserting irregularities in the three agreements because he actively participated in their confection and execution. The Boyd group had reconvened for damages against the executrix on allegations of conspiracy to monopolize the hospital business in the area and to boycott Doctors Hospital. We held the allegations stated a cause of action. Goldblum v. Boyd, 305 So.2d 668 (La.App. 2d Cir. 1975). The lower court rejected the reconventional demands because the Boyd group failed to prove them.
The lower court in concluding its reasons for judgment, viewed the struggle for control *442 of the hospital as a "raw exercise in business maneuvering."
A struggle between opposing groups of corporate shareholders to gain a majority vote to control the management of the corporation epitomizes many attributes of our democratic free-enterprise system. As in the political arena, the heat generated by the power struggle sometimes produces rash accusations from each side. Reasonable and observant people, however, learn that the motives and machinations of one side in degree of integrity, morality and fairness are usually relatively equal and in direct proportion to those of the other side. We do not, in this instance, ascribe any ill motives or wrongdoing to either group.
We agree with the lower court that the matter should be viewed as a raw exercise in business maneuvering.

THE ISSUES
(1) R.S. 12:78(H) requires that a duplicate of the voting trust agreement be filed at the corporate office. A duplicate copy of the trust was delivered in 1971 to the secretary of the corporation at the hospital. Sometime thereafter, one duplicate copy wound up in the personal safety deposit box of Charles E. Boyd in a bank some three miles away from the hospital. Another duplicate copy was in the personal safety deposit box of Dr. Boyd in the same bank. From some time before, and until March 17, 1972, when the point was raised by plaintiff's counsel, the corporate office had available for inspection only a photographic reproduction of a signed duplicate of the trust.
R.S. 12:78(H) reads:
"H. A duplicate of every voting trust agreement shall be filed in the office of the corporation, and it and the record of voting trust certificate holders shall be subject to the same right of inspection by a shareholder of record, or a holder of a voting trust certificate, in person or by agent or attorney, as are the records of the corporation under R.S. 12:103."
R.S. 12:103 provides:
"a. Every corporation shall keep at its registered office, or at its principal place of business in or outside of this state:

* * * * * *
"(2) Records of the proceedings of the shareholders, of the directors, and of committees of the board.
"B. Every corporation shall keep at its registered office, or at its principal place of business or at the office of a transfer agent in or outside of this state, a share register, or a stock certificate record, giving the names of the shareholders, and showing their respective addresses, as and if furnished by each shareholder, the number and classes of shares held by each, and the dates on which the certificates were issued.
"C. If the records required by subsections A and B of this section are not kept at the registered office, information as to their location shall be made available at the registered office. Such records may be in written form or in any other form capable of being converted into written form within a reasonable time. * * *"
The Committee Comment following R.S. 12:103 reads:
"The former law is changed by permitting corporate records to be kept at the principal place of business in or outside of this State, so long as information as to their location is available at the registered office; by requiring a five-day demand; and by conferring discretionary power on the court to deny inspection as to confidential matters."
State v. Keystone Life Ins. Co., 93 So.2d 565 (La.App.Orl. Cir. 1957) struck down a voting trust because a duplicate copy thereof was never filed or available for inspection in the corporate office. Here, a duplicate was filed and thereafter, at least a photographic copy thereof was available for inspection. While the duplicate was not available in the registered office or principal corporate office, its location was available and the duplicate was reasonably accessible, and within the purview of R.S. 12:103.
*443 A voting trust under R.S. 12:78 is a corporate record within the meaning of, and is subject to the provisions of, R.S. 12:103. The requirement "shall be filed" in R.S. 12:78(H), requires simply that, and its meaning should not be extended to prohibit removing the duplicate to a place of safekeeping, when a photocopy is kept available for immediate inspection and the duplicate may be speedily recovered for comparison or further inspection. These circumstances constitute substantial compliance with the applicable law. Moreover, the record does not remotely suggest any prejudice to appellant under these circumstances.
(2) The second issue generally concerns the applicability of state and federal law to the transaction whereby Woolhandler's unrestricted corporate shares were exchanged for voting trust certificates which are heavily restricted by the agreements in question.
The consideration for the voting trust certificates was the corporate shares Dr. Woolhandler gave in exchange. R.S. 51:706(A) prohibits the exchange (within the meaning of sale by R.S. 51:701(3)) of voting trust certificates (within the meaning of securities by R.S. 51:701(1)) which have not been registered in accordance with the Louisiana Blue Sky Law, unless exempt from the provisions of the law. This transaction is not exempted under R.S. 51:704 (exempt securities) or R.S. 51:705 (exempt transactions).
Under R.S. 51:715(A), the executrix is entitled to a return or recovery of the consideration given for the trust certificates. In effect, this section of the Blue Sky Law would warrant the granting of the executrix's demand for rescission of the voting trust and the return to her of Dr. Woolhandler's corporate shares free of the voting trust.
Defendants contend the executrix is barred from claiming rescission on grounds that (1) R.S. 51:715(F) bars her cause of action in this respect, and (2) Dr. Woolhandler would have been estopped to claim rescission under the doctrine of in pari delicto because of his participation in the creation of the voting trust. We find defendants' first contention without merit, but uphold the second contention.
R.S. 715(F) reads:
"F. No person who has made or engaged in the performance of any contract in violation of any provision of this Part or any rule or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract."
The executrix in this instance does not base her suit on the contract (voting trust) and is not attempting to enforce any of its provisions. To the contrary, she is suing to void or rescind the contract. Caldwell v. Trans-Gulf Petroleum Corp., 311 So.2d 80, 85 (La.App. 2d Cir. 1975), affirmed 322 So.2d 171 (La.1975).
State securities acts, called Blue Sky Laws, are patterned after the federal securities laws and their general purpose is to protect the public against acquisition of spurious or worthless securities. In some states, a transaction not in compliance with the Blue Sky Law is void and not subject to ratification by estoppel. In other states, such a transaction is merely voidable. See 84 A.L.R.2d 476. In many of the states where the transaction is merely voidable, the doctrine of estoppel has been recognized to preclude assertion of the invalidity of the transaction under the Blue Sky Law, ibid.
Louisiana declares a transaction in violation of its Blue Sky Law to be voidable (R.S. 51:715). Whether the specific conduct of a purchaser is a sufficient basis for invoking the doctrine of estoppel (in situations in which the doctrine is available) is a question which depends upon the facts of the individual cases. Among the determinative factors are the purchaser's acceptance of dividends, participation in the organization and management of the corporation, and facts showing reliance by the seller upon the conduct of the purchaser. See 84 A.L.R.2d 482.
*444 It is not necessary for us to decide whether the issuance of voting trust certificates violates the federal securities laws because the estoppel defense is also applied under the federal securities laws. See 26 A.L.R. Fed. 682 and Woolf v. S. D. Cohn & Co., 515 F.2d 591 (C.A. 5th, 1975).
Here, Dr. Woolhandler, before the power struggle arose, was a part of the management of the corporation, as a member of the board, as treasurer, as a member of the executive committee and vice-chairman of the board. After the power struggle arose, Dr. Woolhandler continued in these positions. He was one of the organizers of the opposition to the dissident group, albeit secondary to Dr. Boyd who admittedly "ran the show." Dr. Woolhandler pooled his money with his associates and received a ratable share of the stock purchased from uncommitted shareholders to maintain control of the hospital. He was instrumental in seeking and obtaining legal counsel to extend the duration of the Boyd group's control. He was one of the five trustees of the voting trust and voted, as trustee, the stock held in trust. The defendant trustees and the Boyd group relied on Dr. Woolhandler's conduct and the weight of his shares in creating the voting trust. Without the Woolhandler shares the trust would have been an anomaly with less than 50 percent of the outstanding stock of Doctors Hospital, Inc.
The irregularities in the creation of the voting trust and issuance of certificates are equally the fault of Dr. Woolhandler and those who actively participated in the management of the corporation and solicitation of shareholders to exchange their stock for trust certificates. His executrix is estopped to claim rescission of the voting trust because of this. See and compare the activities of the estopped or barred plaintiffs in Nash v. Jones, 224 Ga. 372, 162 S.E.2d 392 (1968); Weinstock v. L. A. Carpet, Inc., 234 Cal.App.2d 809, 44 Cal.Rptr. 852 (1965).
In Woolf, supra, where the defense was not applied, the court summarized the principles applicable to the defense.
". . . [T]he fault of the parties must be `mutual, simultaneous, and relatively equal', and the plaintiff must be an active, essential, and knowing participant in the unlawful activity. Moreover, because of the two-fold purpose of the implied private rights of action that have grown up around the securities acts, deterrence of violations and compensation of those who have suffered pecuniary loss attributable to violations, the degree to which the defendant's unlawful activity affects the investing public must be given substantial weight in determining whether to permit interposition of the in pari delicto defense. Thus, even in a case where the fault of the plaintiff and defendant were relatively equal, simultaneous and mutual, the court might still reject the defense if it appeared that the defendant's unlawful activities were of a sort likely to have a substantial impact on the investing public, and the primary legal responsibility for and ability to control that impact is with the defendant." 515 F.2d 591, 604.
We find no substantial impact will result to the investing public by reason of the defendants' activities in this case.
The voting trust, as against the executrix, will be upheld notwithstanding that certificates thereunder were issued without compliance with state law and perhaps as well, federal law. The purpose of the trust is to unite and maintain majority voting strength of the corporate shares in trustees. There are no restrictions as to transfer of voting trust certificates imposed by the trust. The voting trust certificates are transferable in the same manner as stock certificates under R.S. 12:78(D). The voting trust is expressly authorized by R.S. 12:78(A).
(3) The third series of issues concern the option to purchase granted on March 20, 1971, by Dr. Woolhandler to Dr. Boyd, which we have said is, more correctly, a right of first refusal. The executrix contends this instrument must fall because $25.00 is not serious consideration when *445 weighed against the value of the stock. The record reflects that Dr. Boyd gave a similar agreement to Dr. Woolhandler and others who executed this form of agreement to Dr. Boyd. We also observe that this option or right affected Dr. Woolhandler's corporate shares and other securities. We find sufficient and serious consideration. A right of first refusal in our opinion does not impair the negotiability or the worth of stock to any great degree. If the one who possesses the right desires to exercise it, the shareholder still receives the identical amount offered by his offeror. The shareholder receives his money in either event, and it is simply a difference in the source of the consideration. Either the offerer or the one who has the right of first refusal pays the shareholder.
The Boyd group of defendants further contend that Mrs. Goldblum has not complied with the terms of the option or right granted Dr. Boyd because she did not give to Dr. Boyd a written detailed explanation of the terms and conditions of Charter's offer. At least on two occasions Dr. Boyd had meetings with either or both Mrs. Goldblum and her attorney at which the details of the Charter offer were discussed. The second of these meetings was at the office of the attorney for the hospital. The record fully supports this attorney's admission that "we [Dr. Boyd, etc.] knew the terms of the offer."
Dr. Boyd was given orally the requisite detailed explanation and has not shown any prejudice by not having Charter's offer relayed to him in writing. He conferred with his associates and the hospital attorney before deciding not to purchase Dr. Woolhandler's stock certificates. Under these circumstances, strict compliance with the requirement of written notice may not have been necessary. Cimo v. National Motor Club, 237 So.2d 408 (La.App. 4th Cir. 1970).
The option or right of first refusal affects the Woolhandler "stock or other securities in Doctors' Hospital, Inc." The stock certificates have been exchanged for certificates in the voting trust. Voting trust certificates are equated to stock certificates in Titles 12 and 51 of our revised statutes. R.S. 12:1(F), (R), (S); R.S. 12:78(D), R.S. 51:701(1). By R.S. 12:78(D) voting trust certificates are ". . . transferable in the same manner and with the same effect as certificates of stock under the provisions [of Title 12] . . ." We have upheld the validity of the voting trust. The voting trust certificates are subject to the option or right of first refusal granted by Dr. Woolhandler to Dr. Boyd because of the disjunctive phrase "or other securities."
While Mrs. Goldblum may have substantially complied with the notice provisions of the option or right of first refusal, it is not necessary that we pass on this issue. We have upheld the validity of the voting trust and the Woolhandler shares (trust certificates) were not "free" from the effect of this instrument within the contemplation of the written agreement between Mrs. Goldblum and Charter whereby Charter agreed or offered to buy the Woolhandler shares subject to their being "freed" from three instruments under attack, including the voting trust.

THE SHAREHOLDER'S AGREEMENT
Cimo, supra, generally discussed the legality of restrictions imposed upon the transfer of stock in this language:
"Such agreements are generally recognized and are enforceable when imposed in accordance with the statutory provisions and are not unreasonable and notice of the restriction is placed upon the certificate. LSA-R.S. 12:538 (1950) (12:638 in the statute as amended by Act 105 of 1968). The law favors transferability and the restrictions imposed thereon must be construed accordingly. Phillips v. Newland, 166 So.2d 357 (La.App.3d Cir. 1964); 25 La.L.Rev. 926 (1965); 18 C.J.S. Corporations § 391." 237 So.2d 413.
R.S. 12:638 states:
"Except as provided in R.S. 12:22 there shall be no privilege in favor of a corporation upon the shares represented by a certificate issued by such corporation and there shall be no restriction upon the *446 transfer of shares so represented by virtue of any by-law of such corporation, or otherwise, unless the right of the corporation to such privilege or the restriction is stated upon the certificate." (Emphasis ours and footnote omitted).
The restrictions under consideration here are not "by-law" restrictions, but are restrictions imposed by conventional or private agreement between the parties signatory. The "otherwise" in the statute covers such private shareholder agreements. This illustrates that the same rules and limitations apply to private restrictions as have been applied to by-law restrictions. In this respect, see R.S. 12:29, 57(F) and comments thereunder.
Louisiana cases have not attempted to devise a rule-of-thumb test for reasonableness. Cimo, supra, refused to enforce a restriction on the transfer of stock that the stockholder make his offer to the company in writing, to an officer personally or by certified mail at the company's principal place of business. In doing so, the court recognized our ". . . public policy against unreasonable restrictions against the transferability of stock." 237 So.2d 413. The court also noted:
"The law favors transferability [of stock certificates] and the restrictions imposed thereon must be construed accordingly." ibid.

After adoption of our most recent Business Corporation Law (Act 105 of 1968), one commentary, "The Shareholders' Agreement," observed that the law ". . . only recognizes Shareholders' Agreements that cover lawful subject matter." 19 La. Bar Journal 157, 163. This work further states:
". . . Shareholders' [Agreements] that divide up directorships and corporate offices among themselves, agreements that limit the directors' independent responsibility for corporate management, and agreements which tend to permit shareholders to perpetuate themselves in office generally have been regarded as against public policy in Louisiana, which is a particularly hostile jurisdiction to such agreements between shareholders. Courts have refused to enforce these kinds of agreements either because they conflict with the well-established principle that directors must be the corporate managers and select the officers, that the agreements disregard the fiduciary duties of the directors to the corporation and other shareholders, or because such agreements are thought to be unfair to the noncontracting shareholders. Although the modern trend is to criticize such cases as not reflecting the realities of management and shareholder interests, particularly in close corporations, such agreements have not been validated by the new statute." ibid, (footnote omitted).
One scholarly authority isolates seven factors which influence the court's determination vel non, of the reasonableness of restrictions on stock transfers. These are:
1. Size of the corporation.
2. Degree of restraint on power to alienate.
3. Length of time the restraint is to remain in effect.
4. Method to be used in determining the transfer price of the shares subject to the restraint.
5. The likelihood that a given restriction will contribute to corporate objectives.
6. The possibility that a hostile shareholder would seriously injure the corporation.
7. The likelihood that the restrictions will benefit the corporation. See 2 O'Neal, Close Corporation, § 7.06.
We observe at this point that while some 30 shareholders with 54 percent of the shares are party signatories to the agreement in question, an almost equal number of shareholders with 46 percent of the shares are not subject to the restrictive agreement and may freely deal with their respective shares.
The shareholders' agreement is quoted almost in its entirety. Even a cursory reading of its provisions will reveal:
*447 (1) Unless the transfer is agreed to by 80 percent of the signatories, a third party offeror of a single shareholder is required to extend his offer to purchase to all of the stock and voting trust certificates of the signatory parties, for cash, after depositing in escrow in a bank (in which it is shown Dr. Boyd was Chairman of its Board of Directors), and to leave the offer open and the money deposited for at least 45 days. Then any signatory who desires to accept the third party's offer is himself required to offer his shares to the other signatories. The remaining signatories not wanting to sell, but desiring to buy, are then required to notify the escrow bank of their desire. If the number of shareholders notifying the escrow bank of their desire to buy is less than 100 percent of the shareholders not desiring to sell, then those who have notified the bank of their desire to buy are allowed to elect whether to buy or to sell.
(2) On or after the 45 days (when all of the above dealing (?) has occurred), the shareholder desiring to accept the third party's offer, is required to submit to the corporation and to the Trustees of the Voting Trust (?) (neither of which are signatories to the agreement!!!) proof of compliance with the terms of the agreement. The corporation and the Trustees then have 30 days to determine whether the "proof" is "valid" or to submit the "matter (?)" to Caddo District Court for a "declaratory judgment."
(3) If any signatory attempts to transfer his certificates in any other way, the attempt constitutes an offer to the other signatories to sell his stock at book value, less liquidated damages of $50 per share which is to be deducted from the book value of the stock.
All of the factors Professor O'Neal has gleaned from cases of other jurisdictions (save perhaps the nine-year term of this agreement), weigh heavily against the reasonableness of the restrictions against transferability. Without superfluous elaboration, we hold the agreement an unreasonable restraint against transferability as contrary to the policy of this state.
We held that the issuance of the voting trust certificates was in violation of the Louisiana Blue Sky Law and perhaps as well, in violation of the federal securities law. We further held the in pari delictcestoppel defense appropriate to the circumstances and that Dr. Woolhandler's executrix was estopped or barred from claiming rescission of the voting trust notwithstanding the violation or violations.
Having thereafter held the Shareholders' Agreement to be an unreasonable restraint against transferability and contrary to the policy of this state, we are faced with the obvious question:
Is Dr. Woolhandler's executrix similarly barred or estopped from claiming rescission of the Shareholders' Agreement, notwithstanding the unreasonableness of its restraint against transferability? We answer in the negative.
Dr. Woolhandler's relative and comparative participation in the creation of the Shareholders' Agreement was certainly not less than his participation in the creation of the voting trust and the issuance of certificates thereunder. It is not the distinction, if any, in the degree of his participation in each instance that makes the defense applicable in one instance and not in the other. Instead, it is the difference or distinction in the respective purpose of the laws or policies that produces the result.
The federal and state securities laws require "registration" of securities for the purpose of protecting the innocent investor.
". . . the degree to which the defendant's unlawful activity affects the investing public must be given substantial weight in determining whether to permit interposition of the in pari delicto defense. Thus, even in a case where the fault of the plaintiff and defendant were relatively equal, simultaneous and mutual, the court might still reject the defense if it appeared that the defendant's unlawful activities were of a sort likely to have a substantial impact on the investing public, and the primary legal responsibility for and ability to control that impact is *448 with the defendant." Wooll, supra, p. 604. (Emphasis ours).
We found no substantial impact would result to the investing public by reason of our applying the defense or bar to the violation of the securities law(s).
The purpose or reason underlying the policy favoring transferability of certificates reflecting corporate ownership is fundamental to our economic system. In theory and in practice, we are a commercial nation comprised of individuals who trade among themselves under a competitive, free-enterprise system. Certificates reflecting corporate ownership, even in close corporations (and we do not hold that Doctors Hospital, Inc. is a close corporation), are a part of our commerce. Our laws abound with provisions which favor corporations and dealings in corporate securities and certificates. Indeed corporate certificates have become almost as negotiable as legal tender. Our laws also abound with provisions against the raw exercise of economic power which would unduly and unreasonably affect trade which is the basis of our economy. While some restraints on transferability of corporate certificates are allowed, the restraints must be reasonable and for lawful or reasonable purposes.
An upholding of the in pari delicto -estoppel defense to allow an unreasonable restraint on transferability, would go in the teeth of our long-established policy against unreasonable restraints against transferability of property. This is the substantial impact rationale referred to in Woolf, supra. In excellent briefs, each counsel has cited several cases where the in pari delictoestoppel defense has or has not been applied in state and in federal courts. We have not been referred to any cases considering the applicability of the defense to uphold unreasonable restraints upon transferability of corporate certificates of ownership. The lower court erred in applying this defense to the Shareholders' Agreement.

THE RECONVENTIONAL DEMAND
The record fully supports the rejection of the reconventional demands of the Boyd group. We adopt this portion of the trial court's findings and conclusions:
"Although the allegations of the Reconventional Demands of the defendants set forth a cause of action, we find that defendants have failed to prove the allegations that there was an agreement to monopolize a part of the hospital business in Northwest Louisiana. The evidence shows there to be five hospitals in the City of Shreveport . . . [An expert witness] testified that taking information from American Medical Association Guide to Health Field, he found that by combining the beds of the two hospitals [sought to be `controlled' by Charter] there would be only 16.3 percent of the beds in the area, and while these figures may not be absolutely accurate, they are within a range of reason that we think make his opinion correct; that the ownership and joint operation of Physicians and Surgeons Hospital and Doctors' Hospital, Inc. would not enable the two to create even a part of a monopoly.
"Hospitals, unlike most businesses, are dependent upon the doctors, not the patients, for the business, and while hospitals encourage some doctors to practice at this particular hospital by placing them on the staff or Board of Directors, if for any reason a doctor is dissatisfied at one hospital, he can take his patients to another. Testimony here is that some of the doctors who wanted to sell their stock to Charter were replaced on the Board of Directors of Doctors' and others who had been practicing there began taking their patients to other hospitals, because, according to their testimony, of the deterioration of services at Doctors' others, no doubt, because of personality conflict with some of those signing the agreements. Dissident doctors, as did those in control of the hospital, had discussions concerning their stock and one doctor at one time suggested that they all stop *449 admitting patients to Doctors Hospital, but this was quickly rejected and the evidence does not disclose that there was ever a boycott or an agreement among any of the dissident doctors that they would stop using the hospital.
"We, therefore, find that there was no conspiracy or agreement to boycott or stop using the hospital by any of the dissident doctors, and the Reconventional Demands of the defendants are rejected." (Material in brackets supplied).

CONCLUSION
The ultimate issues concern the validity and effect of (1) the Voting Trust(s); (2) the option or right of first refusal granted by Dr. Woolhandler to Dr. Boyd, and (3) the Shareholders' Agreement. For clarity, we summarize our holding as to each of the three instruments.
(1) The issuance of voting trust certificates to Dr. Woolhandler in exchange for his corporate shares was in violation of state and, perhaps as well, federal securities laws, but Dr. Woolhandler's testamentary executrix is estopped to claim rescission of the voting trust on this basis;
(2) The option or right of first refusal granted Dr. Boyd by Dr. Woolhandler is valid and effective;
(3) The Shareholders' Agreement is an unreasonable restraint against transferability and is therefore invalid and ineffective.
Accordingly, judgment below is recast to read:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that in relation to the affairs of Doctors Hospital, Inc., and as to plaintiff, Belle Virginia Goldblum, as testamentary executrix of the Succession of George J. Woolhandler, and as to defendants and plaintiffs in reconvention: Dr. C. Elmo Boyd, Dr. Harold R. Bicknell, Dr. Emily L. Jones, William B. Wiener, Joan Sanders Carr, Carlos W. Colon, Gloria E. Colon, Linda Marie Colon, Richard A. Colon, Sylvia M. Colon, Wildo D. Colon, Mrs. Daisy P. Crawford, Dora Elizabeth Crawford, Dr. Ernest B. Flake, Dr. D. A. Hiller, Jr., Dr. Bernard M. Kalstone, Chris Youree Kalstone, Marguerite U. Kutschbach, Udine Lynch, Jessee O. Morgan, New Way Laundry & Dry Cleaning Corporation, J. C. Pittman, Clarence C. Pope, Martha Haley Pope, P. Murff O'Neal, Jr., W. Curtis Roberts, W. Theron Roberts, Dr. Jason C. Sanders, Mary Sanders, Thomas Jason Sanders and Dr. M. A. Kutschbach, particularly as concerns:
(A) Those certain voting trusts:
1. Executed by Dr. George J. Woolhandler and others for a five-year term on dates beginning March 5, 1971; and
2. Executed by George J. Woolhandler and others for an eight-year term on dates beginning March 19, 1971, with Dr. George J. Woolhandler, Dr. C. Elmo Boyd, Dr. Harold Bicknell and others as trustees; and
(B) That certain right of first refusal entitled "Option to Purchase" granted by Dr. George J. Woolhandler to Dr. C. Elmo Boyd, dated March 20, 1971; and
(C) That certain Shareholders' Agreement between Dr. George J. Woolhandler and others executed on dates beginning June 9, 1971:
(1) Plaintiff's demands against the validity of the voting trust are hereby rejected;
(2) Plaintiff's demands as to the validity of the option or right of first refusal are rejected;
(3) There is judgment in favor of plaintiff and against defendants declaring the Shareholders' Agreement ((C) above) to be an unreasonable restraint on the transferability of certificates of ownership, whether stock certificates or voting trust certificates, of Doctors Hospital, Inc., and therefore null and void;
(4) The demands of defendants and plaintiffs in reconvention against plaintiff and defendant in reconvention are hereby rejected;
(5) All costs of these proceedings, including appellate costs, shall be paid equally by plaintiff on the one hand, and defendants in solido, on the other.
*450 Judgment AFFIRMED in part, REVERSED in part, RECAST and RENDERED.
NOTES
[1] Mrs. Goldblum also brought a class action suit in federal court. See Goldblum v. Boyd, 60 F.R.D. 421 (W.D.La. 1973), for disposition.
[2] These are referred to generally as the Federal Securities Act of 1933 (15 U.S.C.A. § 77a, et seq. as amended) and the Louisiana Blue Sky Law (LSA-R.S. 51:701 et seq.) and Business Corporations Law (LSA-R.S. 12:1 et seq.).
[3] This was before a stock split of 20-1 was consummated which had the effect of reducing this "estimate" to $100 per share.
[4] One of the group suggesting this, including the name of counsel, was Dr. Woolhandler.
[5] Dr. Woolhandler's estate listed only 671 shares. His heirs (children) owned 275 shares which they had inherited from their late mother.