403 So.2d 780 (1981)
Patricia C. EK, Plaintiff-Appellee
v.
NATIONWIDE CANDY DIVISION, LTD. and Rob L. Lammers, Defendants-Appellants.
No. 8322.
Court of Appeal of Louisiana, Third Circuit.
July 22, 1981.
*781 Camp, Carmouche, Palmer, Barsh & Hunter, David R. Frohn, Lake Charles, for defendants-appellants.
Cox & Cox, James J. Cox, Lake Charles, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and CUTRER, JJ.
GUIDRY, Judge.
Plaintiff, Mrs. Patricia C. Ek, instituted this suit against defendants, Nationwide Candy Division, Ltd. (hereafter Nationwide) and Rob L. Lammers, Nationwide's Director of Operations, seeking the rescission of a contract entered into by Mrs. Ek and Nationwide dated February 22, 1979 and the return of all monies paid by plaintiff to defendant, Nationwide, pursuant to such contract. In addition, plaintiff seeks damages and attorney's fees. In support of her demand, plaintiff alleges fraud, misrepresentation and the violation of LSA-R.S. 51:701-720 (Louisiana's Blue Sky Law) in the negotiation and confection of such contract which pertained to the sale of candy vending machines coupled with a guaranteed income agreement. Prior to trial, defendant Lammers filed a declinatory exception of lack of in personam jurisdiction seeking his dismissal from the suit. In addition, Nationwide filed a motion to stay the proceedings contending that the matter in dispute was referable to arbitration in accordance with the provisions of the contract. Both motions were denied by the trial court and subsequently, a trial on the merits was held.
After hearing the evidence, the trial court concluded that portions of the disputed contract by which Nationwide sought to disavow any responsibility for the representations of its agents and which declared the transaction as not constituting a security offering were repugnant to the laws of Louisiana and contra bonos mores, thus, such provisions were to be considered as unwritten. In addition, the lower court found that Nationwide and Rob L. Lammers made fraudulent misrepresentations to the plaintiff which induced her to confect the contract. The trial court additionally determined that the independent sales contract as modified by the guaranteed income refund policy constituted an investment contract, thus the transaction was governed by the provisions of Louisiana's Blue Sky Law. The trial court then concluded that defendants violated the state's securities law by offering non-exempt, unregistered securities for sale in Louisiana, and thus the contract was, voidable at the instance of the investor. Accordingly, pursuant to LSA-R.S. 51:701, et seq., the trial court ordered defendants to pay plaintiff $6,597.00 with interest of 6% per annum from the date of judicial demand until paid. Also, defendants were assessed with attorney's fees in the sum of $2500.00 and costs of the proceedings. Defendants appeal from that judgment. Plaintiff answered the instant appeal praying for an increase in the lower court's award of attorney's fees as well as an award of attorney's fees for legal services rendered in the course of the instant appeal.[1]
*782 FACTS
On Sunday, February 19, 1979, the following advertisement placed by Nationwide, appeared in the Lake Charles American Press:

"$32,614/Year

Guaranteed Income

No Selling * No Experience

Can Start Part-Time
Company furnishes all protected top quality locations, products, dispensers, displays, supplies, training and guaranteed earnings. We feature America's top brands:
Snickers * Mars * 3 Musketeers * M & M's Milky Way * Starburst * and many more.
ALL you do is service these rental outlets weekly. We insure your success in writing because of the high turn over in sales. You need to be service-oriented, desire your own business and have some operating funds. We do the rest if you qualify.
In Beaumont, Call Mr. Barron
(713) 892-2222
Sunday, Monday, Tuesday, (9-9) only
Nationwide Candy Division
6455 Almaden Expwy, San Jose Calif."
In response to the above, plaintiff contacted Nationwide's representative, Mr. James Barron, to schedule a meeting with him to discuss the advertised business opportunity. Plaintiff, her husband, Steven Ek, and Barron met together on February 19, 1979, at the Holiday Inn in Beaumont, Texas. At that meeting, Mr. Barron made various representations concerning the sale of candy vending machines coupled with a guaranteed income refund policy. Barron explained that the program involved plaintiff's purchase of eight candy vending machines and an initial order of candy supplied by the defendant company. According to the plaintiff, in return for her initial investment of $6,597.00, Nationwide would provide a professional locator who would secure the necessary locations for the vending machines; physically place the machines on the premises; arrange delivery of the machines by the manufacturer; train plaintiff in the repair and maintenance of the machines; supply candy for the machines at the lowest possible cost; conduct seminars to pool information and knowledge from over vending machine operators; and, train the plaintiff regarding the most efficient method of keeping business records. Additionally, Nationwide agreed to guarantee to plaintiff a stated income to be derived from the operation of the machines. Nationwide's guaranteed income refund policy provides that if the plaintiff is not satisfied with her earnings after operating the machines for a one year period, Nationwide will refund 100% of plaintiff's investment less any income derived from the venture. The defendant company guaranteed Mrs. Ek yearly earnings of $10,250.24. At the conclusion of her initial appointment with Barron, Mrs. Ek signed a document entitled, "Non-Disclosure Waiver" in which she agreed not to disclose to others the information she obtained via their meeting for a period of ninety days.
On February 22, 1979, Mr. and Mrs. Ek again met with Mr. Barron in Beaumont at a busy cafe where they concluded the business transaction. At that meeting, Barron presented several documents for the plaintiff's signature including an Independent Sales Agreement, A Guaranteed Income Refund Policy, and a Location Guarantee. Plaintiff signed all of the aforesaid documents and gave Barron a cashier's check for $750.00 as a deposit pending her acceptance as a distributor by Nationwide. Subsequently, Mrs. Ek was accepted by the defendant company and paid to Nationwide the balance due of $5,847.00. On or about May 10, 1979, Mrs. Ek received a "sample" monthly operating statement from Nationwide *783 which prompted plaintiff to call Mr. Lammers at his California office. During their telephone conversation, Mrs. Ek inquired about the promised training seminars and meetings, the procedure for ordering candy, and the validity, in light of accepted accounting principles, of the "sample" monthly operating statement. Plaintiff testified that Lammers indicated that she was not bound to use the "sample" statement and that the training workshop and seminars had not been arranged.
Prior to the delivery of her Nationwide vending machines, plaintiff purchased ten additional vending machines from a woman in the Lake Charles area. Mrs. Ek stated that she operated the machines for several weeks, however, she soon realized that it was impossible to derive the amount of profit from the vending machine venture which was promised by Nationwide. Subsequently, the plaintiff sold the ten machines.
On May 2, 1979, Nationwide's "professional locator", Mr. Eric Kelley, contacted the plaintiff regarding the proposed locations for her machines. Plaintiff testified that contrary to the parties' agreement, Mr. Kelley did not introduce her to the owners of the various locations, but rather, simply drove past the locations pointing them out to her. In addition, Kelley informed plaintiff that he was not responsible for placing the machines at these locations. Shortly thereafter, Mrs. Ek sought the advice of counsel who recommended that plaintiff refuse delivery of the machines. Plaintiff's attorney then contacted Mr. Lammers via mail requesting that Nationwide refund all monies paid by plaintiff to that company in connection with the vending machine transaction. We observe that the record is unclear regarding whether or not plaintiff's counsel sent this letter before or after plaintiff refused delivery of the subject vending machines. Mr. Lammers responded to plaintiff's demands by stating that a refund was impossible and that all written agreements signed by the parties were valid. Thereafter, the instant suit was filed.
Appellants contend that the trial court erred in denying defendant Lammers' exception of jurisdiction and Nationwide's motion to stay the proceedings pending arbitration of the matter. Further, appellants contend that the record fails to substantiate plaintiff's allegations of fraud and misrepresentation in the negotiation and confection of the subject agreements. Finally, appellants contend that plaintiff cannot avail herself of the remedies provided in LSA-R.S. 51:715 (Louisiana Blue Sky Law) because she is unable to tender back the "securities" to Nationwide as required by statute.

JURISDICTION
The trial court concluded that defendant, Rob L. Lammers, is subject to the jurisdiction of the Louisiana courts in accordance with Louisiana's Long Arm Statute, LSA-R.S. 13:3201, and specifically, sections (a) and (b) thereof. LSA-R.S. 13:3201 provides in pertinent part as follows:
"A court may exercise personal jurisdiction over a nonresident who acts directly or by an agent, as to a cause of action arising from the nonresident's
(a) transacting any business in this state;

(b) contracting to supply services or things in this state; ..."
Appellants contend that Lammers is not amenable to suit in Louisiana since he did not have "sufficient contacts" with the Louisiana forum to make the exercise of personal jurisdiction over him constitutional.
The legislative intent in enacting Louisiana's Long Arm Statute was to extend personal jurisdiction of our state's courts to the full extent of due process, specifically to any nonresident who has "minimum contacts" with the forum state. See Drilling Engineering, Inc. v. Independent Indonesian American Petroleum Co., 283 So.2d 687 (La.1973); Aucoin v. Hanson, 207 So.2d 834 (La.App.3rd Cir. 1968); and Soileau v. Evangeline Farmer's Co-op., 386 So.2d 179 (La.App.3rd Cir. 1980). In Soileau v. Evangeline Farmer's Co-op., supra, this court in addressing the issue of in personam jurisdiction stated:

*784 "The finding of jurisdiction over non-residents involves an evaluation of the factual circumstances of the case in light of federal constitutional principles. In order for the proper exercise of jurisdiction in personam over a non-resident there must be sufficient minimum contacts between the non-resident defendant and the forum state to satisfy due process and `traditional notions of fair play and substantial justice' as required by Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); and McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Whether or not a particular defendant has sufficient minimum contacts with a state is to be determined from the facts and circumstances peculiar to each case. Drilling Engineering, Inc. v. Independent Indonesian American Pet. Co., 283 So.2d 687 (La. 1973)."

The evidence adduced at the hearing on the exception to jurisdiction indicates that Lammers is employed by the defendant company in the position of Director of Operations. Plaintiff testified that she spoke with Mr. Lammers by telephone on two occasions and in addition, received a letter from him in connection with plaintiff's contractual agreement with Nationwide. The record reflects that Lammers was never physically present in the state of Louisiana, and that he has never met the plaintiff personally. Further, the record reveals that all payments made pursuant to the subject agreements were made to Nationwide not to Lammers individually and that all contracts and/or documents introduced into evidence at the hearing of the instant matter which were signed by Lammers were executed by him in California in his capacity as Nationwide's Director of Operations. As previously noted, the record is clear that the only Louisiana contacts between defendant Lammers and the plaintiff were two telephone calls and a letter. We conclude that such marginal contacts by Lammers, in his individual capacity, with this state are not equivalent to those "certain minimum contacts with the forum such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice'". Therefore, we determine that the trial court erred in exercising in personam jurisdiction over Rob L. Lammers. Accordingly, we will reverse the trial court judgment and order a dismissal of plaintiff's suit against Rob L. Lammers.

BLUE SKY LAW
The trial court concluded that the contract in question constituted an investment contract within the purview of LSA-R.S. 51:701-720, hereafter referred to as Louisiana's Blue Sky Law, and that Nationwide violated the provisions of such law by offering non-exempt, unregistered securities for sale in the state. Accordingly, the trial court ultimately concluded that the contract was voidable at the instance of plaintiff.
Nationwide does not seriously question the trial court's determination that the subject contract comes within the purview of Louisiana's Blue Sky Law. However, it asserts on appeal that plaintiff cannot avail herself of the remedies provided therein because of her failure to tender back the securities in accordance with LSA-R.S. 51:715.
Although, as aforestated, Nationwide does not seriously question the applicability of LSA-R.S. 51:701 et seq., we consider it necessary to discuss this issue because, in our view, such issue is basic to a proper resolution of the instant controversy.
The record contains an opinion issued by the Louisiana Commissioner of Securities which states that the sale of income producing property coupled with a buy back agreement, such as the transaction in dispute, constitutes a security under Louisiana law and is subject to the registration requirements of the state's Blue Sky Law. We observe that the Commissioner's opinions are merely persuasive and not controlling. See Caldwell v. Trans-Gulf Petroleum Corporation, 322 So.2d 171 (La.1975).
*785 Jurisprudence in the area of Louisiana's securities laws, specifically LSA-R.S. 51:701-720, is relatively undeveloped. Our state's so-called Blue Sky Law was modeled after the federal system, specifically, the Securities Act of 1933 and the Securities Exchange Act of 1934. See Lyman, Securities Regulation in LouisianaA Practical Introduction to the Blue Sky Law, 16 La. Bar Journal 327 (March, 1969); Caldwell v. Trans-Gulf Petroleum Corp., supra; Goldblum v. Boyd, 341 So.2d 436 (La.App.2d Cir. 1976). Finding a dearth of Louisiana case law pertaining to the issues presently before this court, we have consulted several leading federal decisions in this area for guidance.
The central purpose of regulations designed to govern securities transactions is to protect investors through the requirement of full disclosure by issuers of securities. See Goldblum v. Boyd, supra; Herpich v. Wallace, 430 F.2d 792 (U.S. Ct. of Appeals, Fifth Circuit, 1970). Louisiana's Blue Sky Law seeks to accomplish this goal by requiring that all securities offered for sale in Louisiana must be registered with the Office of the Louisiana Commissioners of Securities unless exempted by statute. LSA-R.S. 51:701 provides in pertinent part:
"When used in this Part, unless the text otherwise indicates, the following terms shall have the meanings herein ascribed to each:
(1) "Security" shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, warehouse receipt, certificate of interest or participation, or the right to subscribe to any of the foregoing, certificates of interest in a profit sharing agreement, certificate of deposit for a security, collateral trust certificate, pre-organization certificate, pre-organization subscription, voting trust certificate, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim bond, debenture, note, certificate, or receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract fixed or variable, which is authorized to be written pursuant to Title 22 of the Louisiana Revised Statutes of 1950, as amended.
. . . . .
(5) "Issuer" shall mean and include every person who proposes to issue, has issued or who shall hereafter issue any security. Any person who acts as a promoter for and on behalf of a corporation, trust or unincorporated association or partnership of any kind to be formed shall be deemed to be an issuer. With respect to interests in oil, gas or mineral leases, royalties, or servitudes, any person who shall divide any interest in any such security for the purpose of sale of fractional parts thereof to the public shall be deemed an issuer." (Emphasis ours.)
A review of the federal jurisprudence reveals that the term, "investment contract" embraces within its definition a wide variety of business transactions.[2]SEC v. W. J. Howey, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) is one of the leading federal decisions to discuss the securities law concept of an "investment contract". In Howey, supra, the United States Supreme Court comprehensively defined an "investment *786 contract" as a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.[3] The critical factors in defining a financial arrangement as an "investment contract" and thus, a "security" have been traditionally designated by the courts and commentators as (1) an investment of money, (2) in a common enterprise, (3) with an expectation of a profit, and (4) reliance by the investor upon the efforts of others. See 3 Bloomenthal, Securities and Federal Corporate Law Section 2.04 (1980) and cases cited therein.
The record in the instant case clearly established that the plaintiff, Mrs. Ek, invested the sum of $6,597.00 in the subject vending machine transaction. Additionally, there is no question but that the plaintiff invested her money in the venture with the expectation of deriving a profit. Therefore, for the purpose of this opinion, we focus our inquiry upon whether or not the vending machine transaction was part of a common enterprise and whether the plaintiff relied upon the efforts of others in order to derive a profit from her investment.
We will begin our inquiry by examining whether or not the plaintiff expected to derive a profit via the efforts of others. In the case of United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) the United States Supreme Court stated that "the touchstone (in defining a transaction as an investment contract) is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others". The U.S. Fifth Circuit Court of Appeals in SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (U.S. Ct. of App. 5th Cir. 1974) commented that in determining whether a promotional scheme constitutes an investment contract, "the critical inquiry is whether the efforts made by those other than the investors are the undeniably significant onesthose essential managerial efforts which affect the failure or success of the enterprise." (Emphasis ours) See also SEC v. Glenn Turner Enterprises, Inc., 474 F.2d 476 (U.S. Ct. of App. 9th Cir. 1973). With the aforesaid standard in mind, the most expedient approach to the instant case is to compare and contrast the particular responsibilities and duties of the parties to the subject transaction and determine which party performed or was responsible for "... those essential managerial efforts which affect the failure or success of the enterprise." SEC v. Koscot Interplanetary, Inc., supra. The record reflects that Nationwide agreed to provide the following services to the plaintiff in connection with her monetary investment in the vending machine transaction:
(1) Provide the vending machines;
(2) Arrange the machines delivery by the manufacturer;
(3) Supply the candy (product) for the machines to the plaintiff at the lowest possible price;
(4) Provide a "professional locator" to secure the locations for the machines;
(5) Arrange for the "locator" to introduce the plaintiff to the owners of the premises where the machines would be located.
(6) Present the proposed locations to plaintiff for her approval and acceptance;
(7) Physically place the machines at their proposed locations;
(8) Provide training seminars in the maintenance and repair of the candy vending machines;
*787 (9) Conduct seminars wherein plaintiff and other distributors could pool their information on ways to improve their service and increase their profits;
(10) Provide training in the best methods to employ in keeping accurate business records;
(11) Provide "sample" accounting sheets to plaintiff;
(12) Refund 100% of plaintiff's investment if after one year of operation she was dissatisfied with the profits derived from the transaction upon the return of the machines.
Plaintiff in return for the various services provided to her by the defendant company agreed to:
(1) Pay Nationwide $6,597.00 for the vending machines;
(2) Keep the machines supplied with candy;
(3) Maintain the machines in proper repair;
(4) Maintain the necessary business records;
(5) Approve and accept the proposed locations for the machines;
(6) Buy the candy to supply the machines (testimony at trial indicates that plaintiff was obligated to buy the candy from the defendant company, however, the contract does not contain such a restriction.);
(7) Pay the owner of the premises upon which the machine is located a particular percentage of the gross profits from the machines.
Admittedly, the plaintiff was not totally passive in regard to the arrangement, however, we conclude that Nationwide, not the plaintiff, was responsible for the "essential managerial efforts which would affect the failure or success of the enterprise." SEC v. Koscot Interplanetary, Inc., supra.
Out of all the elements necessary to properly define a business transaction as an "investment contract," perhaps the most elusive is the concept of a common enterprise. A rather concise explanation of this element is contained in 3 Bloomenthal, Securities and Federal Corporate Law (1980) which states:
"The constantly recurring situation that gives rise to an investment contract is the purported sale of specific property such as citrus groves, rental trailers, beavers, mink, breeding cattle, Christmas trees, silver foxes, chinchillas, diamonds, scotch whiskey, etc., accompanied by an arrangement under which the promoters (pursuant to a management contract or otherwise) manage the entire operation and allocate the profits, if any, on the basis of the individual's relative participation. The common enterprise results from the fact that the `investors' are associated in the business of raising and selling citrus fruit, etc., even though they own segregated portions of the assets of the enterprise and have the theoretical right to manage and exploit their own property interest."
In SEC v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the United States Supreme Court held that the sale of oil and gas leases accompanied by the representation that the promoter would drill a well in the general area which would enhance the value of the leases sold involved the sale of investment contracts. In Joiner, supra, the element of common enterprise must be viewed somewhat differently than described by the writer in Securities and Federal Corporate Law, supra, since the properties in Joiner were not collectively managed, but rather, the funds derived from the investors were pooled for the purpose of drilling a well which would enhance (if successful) the value of all interests sold. A strictly analytical approach to common enterprise cannot embrace all of the varied investment contract situations, however, some of the factual circumstances giving rise to such a finding as proposed in the Bloomenthal treatise, supra, include:
(1) A pooling of capital in the sense that the promoter uses funds received from several investors to undertake the activity which will directly or indirectly give value to the investment.
*788 (2) The de facto operation of several investments as one entitycitrus groves, cattle operations, tree farms, animal breeding, mortgage portfolios, etc.
(3) The fact that the bringing together of several investors makes possible the enterprise in question. The Joiner situation, the trust deed case, equity funding and, perhaps, some franchise contracts.
(4) Cutting across several of the foregoing, the fact that the arrangement is essentially a substitute for a more conventional business organization.
The facts of the instant case are analogous to the Joiner-type situation. As evidenced by its widely circulated newspaper advertisement, the defendant company sought a number of persons to invest in the vending machine enterprise. Although each investor serviced his own machines, it is clear that all of the operators were associated to the extent that the money which they invested financed the essential managerial efforts undertaken in their behalf by Nationwide. As noted, Nationwide's efforts, in this regard, ultimately determined the success or failure of the subject business enterprise. Therefore, we conclude that the sale of the vending machines coupled with the guaranteed income policy constituted a common enterprise as defined by the relevant jurisprudence. Thus, after finding all of the requisites of an investment contract, we conclude that the subject business venture constitutes such a contract and is, therefore, a security which is governed by the provisions of LSA-R.S. 51:701-720.
LSA-R.S. 51:706 provides that no securities, unless exempt by statute or unless sold in any transaction which is exempt by statute, shall be sold in Louisiana unless registered with the Louisiana Commissioner of Securities. LSA-R.S. 51:704-705 delineate those securities and/or transactions which are exempt from registration by law. However, the law is clear that a party claiming an exemption under the state's Blue Sky Law has the burden of proving that such securities were, in fact, exempt from the applicable statute's registration requirements. Mr. Harry Stansbury, Deputy Commissioner of Securities for Louisiana testified that Nationwide's securities offering was not registered in Louisiana. In addition, Mr. Stansbury stated that he had no knowledge that such securities were registered with any recognized stock exchange. The trial record reflects that the defendant company introduced no evidence to establish that the subject securities were registered in Louisiana or with any recognized securities exchange. Further, the record is devoid of any evidence establishing that the subject securities transaction was exempt from registration by law. Therefore, we conclude that Nationwide has violated the provisions of LSA-R.S. 51:701-720 by offering non-exempt, unregistered securities for sale in Louisiana.
LSA-R.S. 51:715, which provides civil penalties for violation of the state's Blue Sky Law, states in pertinent part:
"A. Any person who:
(1) Offers or sells a security in violation of R.S. 51:710(A), 51:706 of any rule or order under R.S. 51:706 which requires the affirmative approval of sales literature before it is used, or of any conditions imposed under R.S. 51:707 or 51:708, not including sales of securities exempt under R.S. 51:704, and not including transactions exempt under R.S. 51:705, or,
(2) Offers or sells any security in violation of this part or offers or sells any security, the registration of which has been revoked or suspended by the commissioner under R.S. 51:709, or
(3) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him, who *789 may sue at law to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, cost and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.
B. Every person who directly or indirectly controls a seller liable under Subsection (A), every partner, officer, or director or such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
C. Any tender specified in this section may be made at any time before entry of judgment ...."
Under the above statute, Louisiana declares a transaction in violation of its Blue Sky Law to be voidable at the instance of the person buying the securities upon tender of the securities. Defendant contends that plaintiff cannot avail herself of the statutory remedy because she is unable to tender the securities. In this regard, defendant argues that plaintiff refused delivery of the vending machines which were shipped to her and cannot now return the machines to the defendant. Plaintiff admits that she refused delivery of the machines. The record fails to conclusively establish the ultimate disposition of the subject machines after plaintiff refused to accept delivery.
Without question plaintiff was never placed in physical possession of the vending machines, thus, the only "securities" which she has ever had under her control were the documents signed by the parties in connection with the vending machine transaction. Therefore, the plaintiff's formal tender of these documents at trial is full compliance with the provisions of LSA-R.S. 51:715.
In summary, we conclude that the sale of the candy vending machines coupled with the guaranteed income refund policy constitutes a security subject to the regulations set forth in LSA-R.S. 51:701-720. Further, we find that Nationwide having failed to register the subject security offering with the Louisiana Commissioner of Securities in accordance with the provisions of Louisiana's Blue Sky Law such contract was voidable at the instance of the investor. We will affirm the trial court judgment rendered pursuant to LSA-R.S. 51:715.
Finally, defendant contends on appeal that the trial court erred in denying its motion to stay the proceedings until such time as the dispute could be submitted to arbitration in accordance with the provisions of the contract. In addition, defendant contends that the record fails to establish that Nationwide was guilty of any fraud or misrepresentation in the negotiation and confection of the contested contracts. Since we have determined that the transaction in controversy is voidable at the instance of the plaintiff due to the defendant's failure to register the subject securities as required by law, we need not address these issues.
Plaintiff answered this appeal praying for an increase in the trial court's award of attorney's fees. Additionally, plaintiff prays for attorney's fees for legal services rendered in the course of this appeal. We conclude that the trial court did not abuse its discretion in its award of attorney's fees for services rendered at the trial level. However, we conclude that plaintiff is entitled to attorney's fees in the sum of $500.00 for legal services rendered in the course of the instant appeal.
*790 For the above and foregoing reasons the judgment of the trial court overruling the exception of jurisdiction filed by Rob L. Lammers is reversed and set aside and that exception is now ordered sustained and plaintiff's suit against the said Rob Lammers is dismissed. In all other respects the judgment of the trial court is affirmed, except that the award of attorney's fees to plaintiff is increased from the sum of $2500.00 to the sum of $3000.00. Defendant, Nationwide Candy Division, Ltd., is cast for all costs of this proceeding both at the trial level and on appeal.
REVERSED IN PART AND AFFIRMED IN PART AS AMENDED.
NOTES
[1] Subsequent to the signing of the trial court's judgment, defendants moved for and were granted a suspensive appeal. The defendants filed a suspensive appeal bond on January 16, 1981. On January 27, 1981, defendants filed in the trial court a motion "to revoke order for suspensive appeal and petition for a devolutive appeal." The trial court denied the defendants' motion noting that under LSA-C.C.P. Article 2088, the trial court had been divested of jurisdiction over the case when the suspensive appeal bond was filed. Defendants appealed the ruling of the trial court to this court. This court affirmed the trial court judgment concluding that the suspensive appeal had been perfected and could not be converted into a devolutive appeal without the consent of the appellee.
[2] See Miller v. Central Chinchilla Group. Inc., 494 F.2d 414 (8th Cir. 1974) (Chinchillas); Ferland v. Orange Groves of Florida, Inc., C.C.H. Fed.Sec.L.Rep. ['74-'75 Transfer Binder] ¶ 94,821 (M.D.Fla.1974); SEC v. M.A. Lundy Associates, C.C.H. Fed.Sec.L.Rep. ¶ 94,040 (D.R.I. 1973) (whiskey receipts); Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967) (beavers); "Applicability of Federal Securities Laws to Whiskey Warehouse Receipts." Sec. Act Rel.No.5018 (Nov. 4, 1969), C.C.H. Fed.Sec. L.Rep. ['69-'70 Transfer Binder] ¶ 77,757; American Dairy Leasing Corp., SEC Div. Corp. Fin. No-Action Letter (Dec. 3, 1971), C.C.H. Fed.Sec.L.Rep. ['71-'72 Transfer Binder] ¶ 78,584 (dairy cattle); Investment Diamonds, Inc., SEC Div. Corp. Fin. No-Action Letter, Sec. Reg. & L.Rep.No.111:C-3 (July 21, 1971) (diamonds).
[3] "Where a state statutory definition of the term `security' is identical in all relevant respects to the definition of that term in the Federal Securities Act, there is no reason to believe that the state court will give the term `investment contract' a different construction than have the federal courts in cases involving the federal act." 79 Corpus Juris Secundum Supplement Securities Regulation Section 203 (Footnote 1); also, Chapman v. Rudd Paint and Varnish Co., 409 F.2d 635 (U.S. Ct. of App., 9th Cir. 1969).