367 So.2d 399 (1978)
John Crawford HICKS, Plaintiff-Appellee,
v.
RUCKER PHARMACAL COMPANY, INC., Defendant-Appellant.
No. 13697.
Court of Appeal of Louisiana, Second Circuit.
December 20, 1978.
Rehearing Denied February 28, 1979.
Writs Refused April 23, 1979.
*400 Robert G. Pugh, Shreveport, for defendant-appellant.
Blanchard, Walker, O'Quin & Roberts by Kay C. Medlin; Marlin Risinger, Jr., and Robert Roberts, Jr., Shreveport, for plaintiff-appellee.
Before BOLIN, HALL and JONES, JJ.
En Banc. Rehearing Denied February 28, 1979.
BOLIN, Judge.
This case, consolidated with fifteen related cases, involves the validity and interpretation of a "first option" agreement executed in favor of defendant, Rucker Pharmacal Company, in connection with the sale of its stock to plaintiff, who at the time of the sale was an employee of defendant. Since the issues and determinative facts are the same in all sixteen cases, we shall discuss all the cases in this opinion. The trial court found the agreement invalid and rendered judgment in favor of plaintiffs. We affirm that judgment, although on different grounds, and amend it to allow interest from the date upon which the value of their stock was computed rather than the date of judicial demand.
Rucker Pharmacal Company was chartered in 1958 as a closed corporation with its stock owned exclusively by its founders, Mr. and Mrs. Johnny B. Rucker, and a number of doctors. Shortly thereafter the corporation set aside a portion of its stock for sale to deserving employees. Purchases of this stock were made by plaintiffs at various times from 1963 to 1971.
From 1963 to 1967, the stock was sold subject to an oral agreement that the employee could not transfer this stock to a third person without first offering it back to the corporation at book value or the original sale price, whichever was greater. In 1967 a written contract was executed to evidence this agreement and all stock certificates issued to employees from that point on bore a legend referring to this contract. This contract was revised in 1969 with the additional stipulation that in the event the employee ceased to be an employee, the corporation would again have the right to repurchase the stock at either book value or the original sale price. All employees who were allowed to purchase stock executed one of the 1969 contracts, regardless *401 of the date of their respective purchases. This contract recited the legend affixed to the stock certificates, which reads as follows:
The transferability of the shares represented by this certificate are restricted in accordance with an agreement between the registered owner hereof and Rucker Pharmacal Company, Inc., providing for the non-transferability and for the resale to Rucker Pharmacal Company, Inc., at the sales price in the event owner should leave the employ of Rucker prior to the happening of certain events. A copy of said agreement is on file at the office of Rucker Pharmacal Company, Inc., 6540 Line Avenue, Shreveport, Louisiana, available for inspection. (Emphasis ours)
During this period the corporation grew rapidly, authorizing several stock dividends and two stock splits, a two for one split in 1967 and a four for one split in 1971. Just prior to the four for one split, all employees, regardless of their tenure of employment, were allowed to purchase stock in order for them to benefit from this split.
In 1972 the corporation decided to offer its stock for sale to the general public. By this time the value of the stock on the public market was considerably higher than both the book value and the price originally paid; in some cases as much as twelve times as high. Employees were allowed to participate in the public offering and one-quarter of the stock of each was sold at market value.
Immediately upon receiving payment for their stock sold at the initial public offering, two of the plaintiffs, John Hicks and Orlis Long, resigned as employees. It was apparently their understanding that "the happening of certain events" mentioned in the stock inscription meant the event of the corporation's public offering of its stock and that afterwards their remaining stock would be free of the restriction. The corporation, however, informed them that it considered the restriction to be still in effect and claimed the right to repurchase their stock. When the corporation informed their remaining employees of its position, there was apparently considerable dissatisfaction among them and within the next few months the remaining plaintiffs also resigned.
These suits ensued with plaintiffs demanding they be issued new stock certificates without the restrictive legend, along with damages for any decrease in value of the unrestricted stock during the time it was withheld from them. Alternatively, plaintiffs demanded an award of damages based on the highest value the unrestricted stock reached during the time it was withheld from them.
After trial, the judge retired without rendering judgment and another judge was assigned to decide the case. His judgment was based on a point of law rather than fact, and as a consequence he felt it unnecessary to review the voluminous record in its entirety.
The deciding judge held this option agreement to be an unreasonable restraint against transferability and, as such, contrary to public policy and invalid. In reaching this decision he held the agreement to be an absolute restriction on the transferability of the stock since the market value after the corporation went public greatly exceeded the price to be paid under the option. He further noted that this restriction was unlimited in its duration (i. e., it would last as long as the corporation felt inclined to impose it). Considering these factors, he held the restriction invalid as far as it purported to extend beyond the date of the public offering. It was also his opinion that Goldblum v. Boyd, 341 So.2d 436 (La.App. 2nd Cir. 1977) established the rule that the reasonableness of such option restrictions should be determined as of the time they are sought to be exercised rather than the time at which they are imposed.
As to damages, the judge found that each of the plaintiffs would have sold his remaining stock on the first possible day after leaving defendant's employ. Therefore, he awarded plaintiffs the "bid" value of their *402 stock on these respective days,[1] plus interest from date of judicial demand, rejecting their claims based on the highest market value reached.
Defendant appeals. It contends the trial court erred in the following respects:
(1) In finding this option agreement to be an absolute restriction on the transferability of the stock and applying the law relative thereto.
(2) In interpreting Goldblum to establish the rule that the reasonableness of the option restriction should be considered as of the date of exercise rather than the date of imposition.
(3) In holding this option restriction to be unreasonable.
Plaintiffs answer the appeal seeking an increase in damages based on the highest market value the stock reached during the time it was withheld from them. They also seek to be awarded interest from July 7, 1972, the date they were entitled to receive their stock free of the restriction, rather than from the date of judicial demand. Although they contend the lower court judgment is correct, they further allege that the judgment may be sustained on any of the following alternative grounds:
(1) An interpretation of the 1969 contract as evidencing the intention of the parties to be that the restriction would terminate on the date of the public sale.
(2) A finding that the portion of the 1969 contract granting the corporation the option to repurchase the stock of an employee upon the termination of his employment is voidable by reason of fraud on the part of defendant in leading plaintiffs to believe the option restriction would be lifted upon the conclusion of the initial public sale, when in reality it intended the restriction to be lifted some time later.
(3) As to plaintiffs who purchased stock before the execution of the 1969 agreement, a finding that there was no consideration for this contract whereby the option was granted.
(4) As to plaintiffs Hicks and O. R. Long, a finding that the option was not timely exercised.
At the outset we feel it necessary to address defendant's objection to the admission of parol evidence as to the meaning of the 1969 agreement. This objection is based on defendant's position that the legend recited by the contract and affixed to the stock certificates is not a part of the contract but rather is merely a reference to the contract made in another instrument; and that without this legend, the contract is clear and unambiguous. We find this objection to be without merit. Whether this legend was technically a part of the contract makes no difference. If it is a part of the contract, the phrase "until the happening of certain events" is clearly ambiguous. If it is not part of the contract, but merely a reference to it, the reference would indicate that a term had been agreed upon but was merely omitted from the written agreement. Parol evidence is admissible to show the meaning of an ambiguous term and to prove that a material term, such as the duration of the restriction, was omitted from the written contract. Dufrene v. Tracy, 232 La. 386, 94 So.2d 297 (1957); Rosenthal v. Gauthier, 224 La. 341, 69 So.2d 367 (1953).
Defendant strenuously urges the trial court erred in its characterization of the option agreement as an absolute restriction on transferability. It contends discrepancy between the market price and the option price is not a prohibition against alienation in this case. It further argues that this restriction is valid since it was reasonable when the agreement was executed and was reasonable in light of the manner in which *403 it was exercised. We do not find it necessary to decide these issues. Assuming the option restriction is valid in all respects, defendant cannot prevail since we find that plaintiffs and defendant had in fact agreed, by the 1969 contract, that the restriction would terminate when the company "went public."
The evidence indicates that Johnny B. Rucker, the corporation's president, either directly represented to plaintiffs or deliberately led them to believe that the term "the happening of certain events" meant the initial public sale of Rucker Pharmacal stock. Fourteen of the sixteen plaintiffs were top sales personnel who all testified that Mr. Rucker, before a meeting of the sales staff, made such an explanation of the term in response to a direct question as to its meaning.
The testimony of these witnesses concerning Mr. Rucker's representations to them is entirely reasonable since Rucker, at numerous sales meetings and elsewhere, frequently reminded them that they would all be in a much better financial position because of their ownership of stock when the company went public. Mr. Rucker was apparently fond of telling the "Marion Story", a story of another drug company that sold stock to its employees and then went public, resulting in the employees getting rich. Even the defendant's witnesses, who testified that they did not hear any representation as to the meaning of "certain events", stated they had heard the "Marion Story" and felt their stock would be more valuable after the public sale. A tape recording of a 1970 sales meeting, introduced into evidence, reveals Mr. Rucker telling employees, with reference to Rucker stock, that they were "sitting right on top of a gold mine." The same message is clearly imparted in the following provision of the corporation's supervisors manual:
7. Right here explain that every employee that is with Rucker Pharmacal before they go public will have the opportunity to buy stock at the old price. In fact, employees are the only ones that will be allowed this privilege. (Example They are now paying $6.00 for stock selling for $35.00.) Explain when this stock goes public it will increase a minimum of 100 times in value the first sixty days. (Refer them to the Marion story.)
In no way could the stock benefit employees in the manner described by Mr. Rucker unless they were to have the right to sell the stock after it became valuable. As long as the restriction continued the stock was worth no more to employees than book value or the original sales price, regardless of the value of unrestricted stock.
The evidence also indicates that Mr. Rucker is a very intelligent man and had worked very hard for years to build a successful company. His obvious motive in selling the employees some of the stock was to enable him to attract top caliber salesmen and encourage them to work hard. By placing the restriction on alienation in the 1969 contract he would be able to keep these valuable employees so that when the company went public he would personally receive a tremendous financial benefit. Mr. Rucker and his immediate family owned almost 500,000 shares of Rucker stock. His own gain from the public offering and the subsequent increase in the value of the stock would be astronomical as compared to that of the employees.
Under these circumstances we find it unreasonable to believe that Mr. Rucker, in his relationship with the company's top level employees, planned to mislead them into believing they could sell their stock free and clear of the restriction after the company went public, when in fact he did not intend for them to have this right. He would surely have realized that to mistreat his salesmen in this manner would adversely affect their performance and morale and probably result in termination of their employment. Therefore, we find that Mr. Rucker initially intended to benefit his employees in the exact manner related to them and contracted to end the restriction upon the public offering of Rucker stock.
This conclusion is corroborated by further evidence. Shortly after the date of the initial public offering, the two employees *404 with the largest holdings of employee stock resigned. Reacting to what he felt was a showing of disloyalty on the part of these two key supervisors, Mr. Rucker decided to take advantage of the ambiguous wording of the contract and took the position that the restriction was still in force on employee-held stock.
This caused considerable dissatisfaction among the remaining employees and within a month Mr. Rucker was becoming aware that this position was damaging to the welfare of the company. Therefore, in order to allay employee fears that they had been deceived, Mr. Rucker changed his position by maintaining that any existing restriction on the stock was the result of SEC regulations rather than a corporate refusal to lift the restriction based on the failure of "certain events" to occur. This fact is documented by a letter from Mr. Rucker to Mr. and Mrs. Larry Blansett (P-13) and two tape recordings of a Rucker sales meeting held subsequent to the public offering (P-56A and 57A) submitted as proffers. We note that while SEC regulations may have had an effect on the transferability of stock owned by some of the employees who were the last to purchase, none of the employees who purchased stock before 1970 would be so affected. Therefore, Mr. Rucker's position, at least with regard to this group of employees, which included Mr. Blansett, was deliberately misleading and untrue.
We are not impressed with defendant's extensive efforts to attack the credibility of plaintiffs in connection with their testimony concerning Mr. Rucker's explanation of the meaning of "certain events" which occurred on or about May 3,1969. The evidence does indicate that some of the plaintiffs were not present at the May 3rd meeting. However, plaintiffs all attended countless numbers of these sales meetings and were almost continually bombarded with Mr. Rucker's philosophy relating to stock owned by them and the benefits they would receive from it by virtue of the company's public offering. Under these circumstances, any minor inaccuracies as to dates concerning Mr. Rucker's representation are immaterial.
Although a number of witnesses called on behalf of defendant testified they had never heard Mr. Rucker discuss the meaning of "certain events", several circumstances indicate this testimony should not be given controlling weight. Most of these witnesses were currently employed by the corporation. The stock owned by them was subject to a two-year restriction in accordance with SEC regulations at the time the corporation went public and consequently they probably were not as concerned as plaintiffs about when the restriction would be lifted. The restriction upon all employee-held stock was lifted in December 1972, by action of the corporation's management, which had the effect of totally eliminating their concern about when the restriction would be removed, and perhaps affected their testimony with regard to what they had failed to hear Mr. Rucker explain about the restriction.
For the foregoing reasons, we hold that plaintiffs and defendant, through its president Johnny B. Rucker, agreed, by the 1969 contract, that the restriction on alienation of the stock, providing for a first option in favor of defendant, would terminate upon the initial public sale of defendant's stock, which occurred on March 9, 1972.
As to damages, plaintiffs contend the trial court's ruling that they should be awarded the bid value of their stock on the first day it would have been available for sale after termination of their employment is erroneous. They contend damages should be awarded based on the highest market value reached by Rucker Pharmacal stock during the time it was wrongfully withheld from them. Plaintiffs also contend they should be entitled to interest from July 7, 1972, the date they were entitled to receive their stock free of the restriction, rather than from the date of judicial demand as awarded by the trial court.
We agree with the trial court that plaintiffs are not entitled to recover damages based on the highest value the stock reached. That would require speculation that plaintiffs would have been wise enough to hold their stock until the peak *405 was reached and on that day dispose of it. We find the trial court's determination that plaintiffs would have sold their stock at the first opportunity after termination of their employment was correct. Damages were properly awarded in favor of each plaintiff based on the market value of the stock on the day of his termination, subject to the 120-day holding period provided in the underwriter's agreement. Consequently, all plaintiffs who terminated their employment prior to July 7,1972, the expiration date for the holding period, are entitled to the value of their stock as of that date. All plaintiffs who resigned after July 7 are entitled to the value of their stock as of the date of their resignation.
These respective dates are also the proper dates to begin the tolling of legal interest in favor of each plaintiff, rather than the date of judicial demand. All debts bear interest from "the time they become due." La.Civil Code article 1938. However, an unliquidated claim is only due from the time it becomes ascertainable. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). Although the debt in this case may have been technically due on July 7, 1972, the date the plaintiffs should have received their stock unrestricted, the amount of this debt only became ascertainable on the date that the company, through its continued imposition of the restriction, prevented plaintiffs from selling their stock. As to plaintiffs John Crawford Hicks, Orlis R. Long et al, James E. Duffer, Charles C. Turner, and James Ralph Moreland, all of whom resigned before July 7, this date will be the proper date from which interest will be due. As to all other plaintiffs, who resigned after July 7, the proper dates to begin the calculation of interest will be the dates of their respective resignations.
The judgment is amended to provide for interest to run from July 7, 1972 until paid. Otherwise, the judgment is affirmed at appellant's cost.
NOTES
[1] As part of the public offering, all plaintiffs agreed to sell one-fourth of their stock to the underwriter and further agreed that the remaining three-fourths would not be subject to sale until 120 days after March 9, 1972, the date of the initial public offering. Consequently, all plaintiffs who resigned during this 120-day period were awarded the bid value of the stock on the 120th day, July 7, 1972. All other plaintiffs, who resigned after this date, were awarded the "bid" value of their stock as of the date of their resignation.