418 So.2d 706 (1982)
DRS. BROWN, CARTER & SAULS, Plaintiff-Appellee,
v.
Dr. J. Lane SAULS, et ux., Defendants-Appellants.
No. 82-124.
Court of Appeal of Louisiana, Third Circuit.
July 28, 1982.
Rehearing Denied September 15, 1982.
*707 Hargrove, Guyton, Raney & Barlow, Billy R. Pesnell and David R. Taggart, Shreveport, for defendants-appellants.
Leithead, Scott, Boudreau & Myrick, Everett R. Scott, Jr., Lake Charles, for plaintiff-appellee.
Before SWIFT, DOUCET and LaHAYE[*], JJ.
SWIFT, Judge.
The plaintiff, Drs. Brown, Carter & Sauls (A Professional Medical Corporation),[1] filed this suit against Dr. J. Lane Sauls and his wife for specific performance of a stock purchase agreement and for an accounting by Dr. Sauls of any monies received by him and owed to the corporation. From a judgment rejecting plaintiff's demand for an accounting but granting plaintiff's demand for enforcement of the stock purchase agreement, the defendants have appealed.
On November 15, 1971, a stock purchase agreement was entered into by the plaintiff corporation and its shareholders, Dr. Etienne R. Brown, Dr. Henry S. Carter and Dr. J. Lane Sauls, and their wives. The parties to the agreement stipulated that upon the termination of a shareholder's employment, the corporation would buy and the affected shareholder would sell all the shares of stock held by that stockholder at a price computed as follows:
"The purchase price for each share of the capital stock of the Corporation shall be its book value as of the end of the calendar month in which death, termination of employment or retirement occurs, or the end of the calendar month following the aforesaid twelve month period of permanent disability, which book value shall be determined by the accountant for the Corporation from its books and records without attributing any value to any good will of the Corporation or any outstanding accounts receivable. The purchase price as determined in accordance with the foregoing provisions, shall be payable by the Corporation to the Stockholder or to his surviving spouse and heirs or to his succession representative or curator if inderdicted (sic), as the case may be, within sixty (60) days following the valuation date as hereinabove provided."
By written notice on February 1, 1979, Dr. Sauls terminated his employment with the plaintiff corporation effective March 16, 1979. At that time he owned 80 shares of the corporation's outstanding 240 shares of capital stock. By letter dated February 27, 1979, the plaintiff acknowledged receipt and acceptance of Dr. Saul's resignation and informed him that Ralph Johnson, the corporation's accountant, had been requested to determine the book value of the capital stock in accordance with the agreement.
In a letter dated April 20,1979, Mr. Johnson reported to the corporation that on March 31, 1979, excluding the effect of receivables and good will of the corporation, the net assets amounted to $90,183.32 and the book value per share of stock was $375.76. On April 23, 1979, the corporation notified Dr. Sauls of the evaluation and of its willingness to pay him $375.76 per share for his 80 shares upon delivery of the stock certificates. Subsequently, the plaintiff acknowledged an error in the previous computation of book value due to the omission of an item of prepaid rent in the amount of $3000.00. The inclusion of this item increased the original book value determination by $12.50 per share to $388.26.
Dr. Sauls disagreed with Mr. Johnson's evaluation and did not deliver his stock to the corporation. On June 7,1979, the plaintiff corporation filed the present suit.
Dr. Sauls has not questioned the validity of the stock purchase agreement, but merely challenges the correctness of Mr. Johnson's determination of the book value of the stock. The defendants, based on the testimony *708 of two accountants engaged by them (Messrs. Wayne Wilson and Peter Bratlie), contend that Johnson omitted several assets of the corporation from his evaluation and that the true book value of the corporation on March 31, 1979, was $935.25 per share.
The court after trial agreed with the defendants' position in several respects and found the book value under the stock purchase agreement to be $471.69 per share as of the valuation date. However, in reaching this figure, it rejected their contentions that the following items should have been included as assets in the computation:
1) Leasehold improvements in the amount of $19,045.00.
2) Prepaid insurance in the amount of $5,083.08.
3) Prepaid rent in the amount of $70,000.00.
The judgment granted specific performance of the purchase agreement and awarded seven per cent interest from the date of judicial demand on the difference between the sum offered by the corporation to the defendants before the filing of suit and the amount finally determined to be the purchase price of the stock.
The issues raised by this appeal are whether the trial court erred in failing: 1) to include the above assets in its determination of the book value of the stock; and 2) to award interest on the whole amount of the correct purchase price and if so from what date.
In the Succession of Jurisich, 224 La. 325, 69 So.2d 361 (La.1953), our supreme court said that the term "book value" in a similar agreement was the value of an asset as reflected by the books of account of the company, as distinguished from the actual or market value of the asset. Of course, the business records must be kept correctly and consistently according to reasonable accounting principles and practices.
In omitting the aforementioned three items from its determination of the book value of the stock, the trial court in the present case assigned clear and convincing written reasons for its decision. We approve and adopt as our own the following portions of the opinion:
"The remaining items in dispute, leasehold improvements, prepaid insurance. and prepaid rent, are of a different nature than the items that have been considered. They involve corporate expenditures made in previous years and expensed on the books and records, but which Dr. Sauls and his accountants contend were corporate assets on March 31, 1979. These items were never recognized by the corporation as assets and they were never carried on the books and records as such. Accordingly, they were not included in Mr. Johnson's computation of book value.
"The alleged leasehold improvements, prepaid insurance and prepaid rent were `discovered' by Messrs. Wilson and Bratlie during their two day examination of all the books and records of the corporation. Based on their findings, and believing that such action was required by the generally accepted accounting principles that apply to the cash system of accounting, Wilson and Bratlie included those three items as assets of the corporation. The accountants maintain that, in determining book value from corporate books and records, if there is deviation from generally accepted accounting principles, the books and records must be revised and corrected in accordance with the applicable accounting principles. They contend that is what they have done in this case.
"Plaintiff corporation argues that the provisions of the stock purchase agreement do not require or permit an audit of all the books and records of the corporation and make no requirement that the books and records be maintained according to generally accepted accounting principles or in any particular manner. Plaintiff further argues that in the stock purchase agreement the parties elected to use book value as the standard for the price to be paid and that this was done to avoid the necessity of an audit and the complications and pitfalls inherent in other types of evaluation. Plaintiff also contends that the accounting procedures and practices followed by it have *709 been consistent from its beginning and that it is improper and unfair to now accrue as assets of the corporation items that have long since been expensed on the books, all with the knowledge and approval of Dr. Sauls.
"It is necessary to discuss the factual contentions of the parties in order to properly understand these particular items and the issues they present. The leasehold improvements will be considered first. Messrs. Wilson and Bratlie found five checks which they believe represented payments for improvements to the leased premises which, in their opinion, should have been capitalized on the books of the corporation and depreciated over a period of years. Those five checks were as follows: for $5,001.73 to Nolen Construction Company, dated March 6, 1974; for $3,600.00 to Nolen Construction Company, dated April 19, 1974; for $369.09 to W. L. Deggs Construction Company, dated July 11, 1974; for $2,573.90 to Nolen Construction Company dated December 2,1976; and for $13,155.82 to DeRidder Clinic, dated May 30, 1977 (of which $7,500.00 was believed to be for leasehold improvements). Considering the size of those five payments and having satisfied themselves that there had been some improvements to the leased premises during the term of the lease, Messrs. Wilson and Bratlie concluded that the corporation had improperly expensed the cost of the work during the years when the payments were made. Thus, they reclassified the five payments, which totaled $19,044.72, from expenses to leasehold improvements, and considered them an asset of the corporation.
"Plaintiff corporation denies that all five of those expenditures were for leasehold improvements. Specifically, it denies that the payment of $369.09 made to W. L. Deggs Construction Company on July 11, 1974, and the payment of $7,500.00 to De-Ridder Clinic on May 30,1977, were for improvements. The corporation contends that the payment of $369.09 was for ordinary repairs to air conditioning equipment and that the payment of $7,500.00 covered both ordinary repairs to the premises and maintenance services rendered to the corporation over a period of several years. On this factual issue the evidence does not establish that those particular payments were for leasehold improvements.
"As to the remaining three payments, two in 1974 and one in 1976, all to Nolen Construction Company, plaintiff corporation admits that they were for improvements and not ordinary repairs, but contends that it would be improper and unfair at this late date to capitalize those payments and consider them as assets after the management of the corporation, which included Dr. Sauls, had elected to expense the items and take the resulting tax benefits. The corporation further contends that the handling of the payments as expenses was never a source of contention between it and the shareholders, including Dr. Sauls, until this law suit arose and until Messrs. Wilson and Bratlie reviewed the books and records.
"The next item for consideration is prepaid insurance. Messrs. Wilson and Bratlie said that the books and records of the corporation show that on March 31,1979, there was $5,083.08 in prepaid insurance, which, in their view, should be considered an asset of the corporation. While the premiums had been paid prior to March 31, 1979, and the terms of the policies did not exceed one year, the periods of coverage extended beyond the closing date of March 31, 1979, and, for that reason, the accountants maintain that the unearned premiums should be considered an asset. However, it should be noted here Mr. Wilson testified that the inclusion of prepaid insurance as an asset is arguable in this case because it is based on the accrual system of accounting and not on the cash system. Mr. Wilson also stated that prepaid insurance policies with a term of only one year are not usually included as an asset on a financial statement of a cash basis taxpayer.
"Plaintiff corporation contends that since it used the cash system of accounting and had paid the premiums prior to March 31, 1979 (with most premiums having been paid before October 31, 1978, the end of the last *710 fiscal year), and had historically and routinely expensed such payments when made, it would be improper and unfair to capitalize the payments and consider the unearned premiums as an asset, especially since none of the policies had a term of more than one year. Further, the corporation contends, as it did in the case of the leasehold improvements, that it would be improper and unfair to go back and change the usual and customary accounting practices that had been followed through the years, especially since those practices were well known to and concurred in by Dr. Sauls, who, along with the other shareholders took advantage of the tax benefits that resulted.
"The last item involves what Messrs. Wilson and Bratlie described and characterized as prepaid rent. After their examination of the books and records the accountants reported that the corporation had overpaid rent to DeRidder Realty, Inc. in the amount of $70,000.00. They reach that conclusion after examining a written lease agreement between plaintiff corporation and DeRidder Realty, Inc., dated November 15, 1971, which provided for a monthly rental of $1,500.00 for a primary term of five years with an option to renew for an additonal (sic) five years at the same rental, all available minutes of meetings of directors and shareholders, and records of payments made to DeRidder Realty, Inc. for rent between November 15, 1971 and March 31, 1979. Mr. Wilson said the original lease was authorized by the board of directors of the corporation, but there was no authorization for a rent increase except in October, 1973, when the corporation was authorized to enter into another lease with DeRidder Realty, Inc. for a parking lot at a monthly rental of $500.00. Yet he found that in 1973 the monthly rental payments to De-Ridder Realty, Inc. were substantially increased above the amount authorized in the corporate minutes. Mr. Wilson said that the excess payments, between 1973 and March 31, 1979, amounted to $70,000.00. He stated that since the amount paid substantially exceeded the amount of rent owed to DeRidder Realty, Inc., he considered the overpayment of $70,000.00 as prepaid rent and recognized it as an asset of the corporation.
"Plaintiff corporation denies that there was any prepayment of rent to DeRidder Realty. It contends that the amount of rent paid between November 15, 1971, and March 31, 1979, was the amount due and payable as a result of informal agreements made, approved and ratified by the three shareholders of the corporation. However, Dr. Sauls denies that he ever consented and agreed to any rent increase except the one authorized by the board of directors in October, 1973. Dr. Sauls also maintains that he had no knowledge of any other increase in rent until May, 1977, when he received the first computer print-out, and that he protested vigorously at that time.
"Dr. Sauls testified that when the original lease was made on November 15, 1971, the rent was fixed at $1,500.00 per month because it was believed that a charge of $500.00 per month per doctor would be fair. He admitted that there was some discussion of a rent increase of $500.00 a month in January or February, 1973, when the corporation employed Dr. Vines and he established his office in the building. The amount of that proposed increase was consistent with the original idea that $500.00 per month per doctor would be a proper charge. There was another development in January, 1974, when another tenant, Dr. Peters, who had dental offices in the building, vacated approximately 900 square feet of office space. That area was taken over by plaintiff corporation and, after some remodeling work was done, it was given to Dr. Sauls as his office space. Dr. Peters had been paying DeRidder Realty $500.00 per month for that space and, according to Dr. Brown, the plaintiff corporation, by informal agreement of the three shareholders, agreed to pay the same amount. Thus, plaintiff corporation contends that the monthly rental was increased from $2000.00 to $3,000.00 because of (1) the employment of Dr. Vines in 1973 and (2) the acquisition in early 1974 of additional office space that had been occupied by another tenant.
*711 "Dr. Sauls admitted that as early as February, 1974, he saw financial statements prepared by the office administrator of the corporation which showed rent payments of $3,000.00 per month. The minutes of meetings of the board of directors and the shareholders in November, 1973, and in subsequent years, indicate that annual financial reports of the corporation were presented and approved. Those minutes indicate that Dr. Sauls was present at those meetings. However, according to the minutes, Dr. Sauls never raised a question concerning the financial reports or the lease with De-Ridder Realty until the meeting of November 26, 1978, which was after he had announced his intention to terminate his employment with the corporation. At that meeting Dr. Sauls asked some questions about the lease agreement and its terms, the purchase of his shares by the corporation, and his severance benefits. The minutes state that the terms of the lease were discussed; that some confusion existed concerning renewal of the lease because it had been done informally; and that it was agreed by common consent of the shareholders and directors that legal assistance would be obtained in order to clarify the situation.
"While there is some conflict in the evidence, the Court finds that it is more probable than not that Dr. Sauls was aware of and, at least tacitly, approved the increases in rent. This finding is supported by his admission that there was a discussion of a rent increase of $500.00 a month when Dr. Vines was employed by the corporation and established his office in the building, and that $500.00 per month per doctor was believed to be fair. It is also supported by the undisputed fact that in January, 1974, plaintiff corporation acquired additional office space (for the use of Dr. Sauls) that had been leased to Dr. Peters for $500.00 per month. No explanation is offered by Dr. Sauls as to why he expected that space to have been furnished to plaintiff corporation rent-free. Everything considered, it does not appear to the Court that the increases in the rent were excessive, unreasonable or unfair.
"The Court believes that Dr. Sauls was mistaken when he testified that he did not know the rent had been increased to $3,000.00 a month until he received the first computer print-out in May, 1977. He was an employee, officer (vice-president), director and shareholder of the plaintiff corporation at all times between November 15, 1971 and March 16,1979 (the date he terminated his employment). He was on the scene on a day to day basis and was actively involved in the management of the corporation. He had access to the books and records to the same extent as the other two doctors. There is no evidence that any effort was made by anyone to conceal any information from him. Further, Dr. Sauls candidly admitted that he probably had signed rent checks payable to DeRidder Realty. He said normally such checks were prepared and signed by the office administrator and then presented to him or one of the other doctors for counter-signature.
"The monthly rental payments to DeRidder Realty, Inc. were expensed on the books when made and, regardless of how Messrs. Wilson and Bratlie may have viewed the payments, it is clear that plaintiff corporation considered it was paying only current rent and not prepaying future rent. There is no evidence that remotely suggests otherwise. On the facts presented, the accountants were not justified in classifying the alleged over-payment of rent as an asset of the corporation."

* * * * * *
"While the manner in which the corporation handled payments for improvements to the leased premises may leave something to be desired from an accountant's point of view, the fact remains that the corporation was entirely consistent in the handling of such payments and Dr. Sauls was aware of the procedure that was followed. The decision to expense the payments for such improvements no doubt produced some favorable tax benefits for the corporation and the shareholders. Perhaps the Internal Revenue Service would have been entitled to question the manner in which the payments for improvements were handled on *712 the tax returns, but Dr. Sauls is not entitled to question the payments at this late date. He is estopped now to challenge what he approved of and benefited from earlier.
"As for the prepaid insurance, the evidence shows that the terms of the policies did not exceed one year and most of the premiums were paid and expensed in the preceding fiscal year which ended October 31, 1978. There was nothing unusual or suspicious about the payment of those premiums. They were handled on the books and records of the corporation in the usual and customary manner. Dr. Sauls did not complain of that handling and he, along with the other shareholders, took advantage of the resulting tax benefits. The accountants, Messrs. Wilson and Bratlie, expressed some doubt about the validity of including the prepaid insurance as an asset. Under the facts and circumstances presented in this case, the Court concludes that the prepaid insurance cannot be considered an asset of the corporation for the purpose of computing book value under the terms of the stock purchase agreement."
From our review of the record and the law, we are in full accord with the trial court's findings and reasons for excluding the aforementioned three items in determining the book value of the stock of the plaintiff corporation. We also agree with its decree granting specific performance of the stock purchase agreement and ordering the plaintiff to pay $471.69 per share upon delivery by the defendants of the certificates for their stock.
The remaining issue on appeal is whether the trial court erred in its award of interest. The defendants argue that the court should have awarded legal interest in different percentages on the whole purchase price of the stock from May 30, 1979, the valuation date expressed in the stock purchase agreement.
According to Roques v. Alfonso, 399 So.2d 1294 (La.App. 4 Cir. 1981):
"LSA-C.C. Art. 1938 provides that all debts shall bear the specified rate of legal interest `from the time they become due, unless otherwise stipulated.' An unliquidated claim is due from the time it becomes ascertainable. Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978); Hicks v. Rucker Pharmacal Co., Inc., 367 So.2d 399 (La.App. 2nd Cir. 1978), writ denied, 369 So.2d 1360 and 1361 (La. 1979)."
Interest was awarded in Roques to the plaintiff contractor on a retainage from date of the judgment, because his right thereto depended on the trial court's determination of whether or not certain defects existed in the work done under the contract.
In Hicks, supra, the court held that the plaintiffs were entitled to legal interest on the public selling price of their stock from the date they were entitled to receive it from the corporation free of a restriction as to sale, because this was the date on which the amount of the corporation's debt became ascertainable.
In view of the dispute between the parties as to the method of determining the book value of the stock in the present case, it would appear that the purchase price thereof was not ascertainable until rendition of judgment by the trial court. Be that as it may, the stock purchase agreement in this case provides reciprocal obligations to be performed by the parties at the same time on the valuation date, i.e., the corporation is to pay for the stock at the time the stockholder delivers the stock certificates. In such case under LSA-C.C. Art. 1913 one party has not defaulted in his obligation under the contract unless the other party has offered or performed his obligation at the time specified in their agreement.
There is no indication in this record that the defendants have ever offered or attempted to deliver their stock certificates to the plaintiff at any specified price. Therefore, in our opinion the plaintiff is not obliged to pay the purchase price for the stock until the stock certificates are delivered and no interest is due thereon until this is done. Although the interest award in the judgment is in error, since the plaintiff *713 has not appealed or answered the defendants' appeal we cannot amend the judgment in its favor by deleting that award.
For the foregoing reasons, the judgment of the district court is amended to change the date to carry out the sale and purchase of the defendants' stock from November 16, 1981, to 15 days after the judgment becomes final (or if that day is a holiday, the first legal day thereafter), and in default of payment of the purchase price upon delivery of the stock certificates to provide legal interest on the full value of the stock from such date until paid. Otherwise the judgment is affirmed. The costs of this appeal are assessed to the defendants.
AMENDED AND AFFIRMED.
NOTES
[*] Honorable Joseph A. LaHaye of the 27th Judicial District Court, State of Louisiana, participated in the decision as a Judge ad hoc.
[1] The plaintiff corporation subsequently changed its name to DERIDDER CLINIC, A PROFESSIONAL CORPORATION.